STATE OF NORTH CAROLINA v. KEITH BARTS

No. 524A84

(Filed 3 June 1986)

**1. Criminal Law § 75— inculpatory statement—written by SBI agent—signed by defendant—admissible**

The trial court did not err in a prosecution for murder, breaking or entering, robbery, and larceny by denying defendant's motion to suppress his inculpatory statement on the grounds that it was reduced to writing by an SBI agent rather than defendant where the agent testified that he transcribed defendant's statement exactly as it was given, read it back to defendant and asked if any changes needed to be made, defendant indicated one change, defendant then read and signed the statement, defendant did not contest the conclusion that the statement was made freely and voluntarily, and defendant did not challenge the accuracy of the written transcription.

**2. Constitutional Law § 63; Jury § 7.11— death qualified jury—no violation of U.S. Constitution**

The death qualification of a jury is not prohibited by the Sixth and Fourteenth Amendments to the U.S. Constitution. *Lockhart v. McCree*, 90 L.Ed. 2d 137.

**3. Constitutional Law § 63; Jury § 7.11— death qualified jury—no violation of North Carolina Constitution**

The practice of death qualifying the jury does not violate Art. I, Section 19 of the North Carolina Constitution; most of the social science studies cited by defendant as indicating that death qualified juries are more conviction prone than those which are not death qualified were found by the U.S. Supreme Court to contain serious flaws.

**4. Jury § 6— motion for sequestration and individual voir dire denied—no error**

The trial court did not err in a prosecution for murder, breaking or entering, robbery and larceny by denying defendant's motion for sequestration and individual *voir dire* of prospective jurors where the trial judge inquired during the examination of the first twelve veniremen as to how many had read newspaper articles about the case; four jurors indicated that they had; all potential jurors other than the twelve in the jury box were excused; the four jurors who had read the newspaper articles and one additional juror who subsequently stated that he had read the articles and seen television coverage were ques-

State v. Barts

tioned; they were not asked to relate the contents of the articles, but were asked whether they had participated in any discussion in the community; one juror stated that she had formed an opinion and that she did not feel she could be fair to both the State and defendant and was excused for cause; the other four jurors stated that they had not formed an opinion and could be fair to both sides; the only feasible location where jurors could have been individually questioned was in one of the Alamance County District Court courtrooms; and the trial judge stated that he was denying the motion after personally viewing the district court facilities and consulting with the Chief District Court Judge concerning the schedule of the district court. N.C.G.S. § 15A-1214(j).

5. **Jury § 7.12— murder prosecution—prospective juror upset over death penalty —excluded—no error**

The trial court did not err in a murder prosecution by excluding for cause a prospective juror who first stated that she could vote for the death penalty; stated the next day that she had become very agitated over the prospect of having to decide whether to impose the death penalty; had found it necessary to consult a physician, who had prescribed a sedative; and felt that her emotional condition would detract from her ability to concentrate on the case and that she would be unable to vote to impose the death penalty under any circumstance. N.C.G.S. § 15A-2000(a)(2), N.C.G.S. § 15A-1212(8).

6. **Criminal Law §§ 128.2, 101.1— newspaper article appearing during trial—motion for mistrial denied—no abuse of discretion**

The trial court did not abuse its discretion in a prosecution for murder, breaking or entering, robbery and larceny by denying defendant's motion for a mistrial based on a newspaper article appearing during the trial in which it was reported that defendant had pled guilty to the charge of conspiracy to commit armed robbery and which recited portions of *voir dire* testimony concerning statements made by defendant's cousin after the robberies. The trial judge reminded the jury that he had given them certain instructions at each recess regarding their duties as jurors and asked if any juror had violated those instructions; one juror replied that she had used the wrong set of stairs when entering the courthouse the previous day; the record was devoid of any evidence that any juror had read or otherwise been exposed to the article in question; and there was no showing that the court's mode of questioning was ineffective in ascertaining whether exposure to the article had occurred.

7. **Criminal Law §§ 128.2, 102.5— improper question—asked after objection sustained—jury examined and instructed—mistrial denied**

The trial court did not abuse its discretion in a prosecution for murder, breaking or entering, robbery and larceny by denying defendant's motion for a mistrial based on prejudicial testimony where the trial court had ruled on *voir dire* that a witness could only testify about statements made by defendant or a co-conspirator concerning one other break-in; the witness was asked after the jury returned what she had heard the co-conspirator say about defendant; and the witness testified that the co-conspirator had said he had known the defendant for several years and had set him up on three jobs. The judge immediately sustained defendant's motion to strike, instructed the jury to disregard the

testimony, and asked the jurors if they could follow that instruction, and all the jurors indicated that they could.

**8. Criminal Law § 34.8— breaking or entering—prior offense—admission erroneous—no prejudice**

There was no prejudice in a prosecution for breaking or entering where the trial court erroneously admitted testimony concerning defendant's custodial statement that he and two other men had committed another breaking or entering three years earlier. The plausibility of the existence of an ongoing plan to engage in a scheme to rob others was negated by the remoteness in time between the two offenses, but there was no prejudice in light of the overwhelming evidence of defendant's guilt. N.C.G.S. § 15A-1443(a) (1983 and Cum. Supp. 1985).

**9. Homicide § 21.6— first degree murder—premeditation and deliberation—evidence sufficient**

There was sufficient evidence to convict defendant of first degree murder based on premeditation and deliberation in that there was no evidence that the victim provoked the attack; defendant went to the victim's residence armed with a baseball bat and a crowbar; defendant told the driver on returning to the car that they had to beat the man; the day after the killing, defendant told two witnesses that he had robbed the victim the previous evening and thought that he had killed him and that he had beaten the victim until the victim stopped moving and until he got tired of beating him. N.C.G.S. § 14-17 (1981 and Cum. Supp. 1985).

**10. Homicide § 21.6— murder during perpetration of felony—evidence sufficient**

The evidence supported the jury's finding that the killing occurred during the perpetration or attempted perpetration of a felony within the purview of N.C.G.S. § 14-17 where there was plenary evidence that defendant himself killed the victim during the commission of an armed robbery, the trial judge instructed the jury that it could convict under the felony murder rule if it found that defendant acted alone or in concert with Earl Barts, there was plenary evidence that defendant was engaged in a common plan with Earl Barts to perpetrate a felony against the victim and that defendant was present at the scene of the robbery, and there was evidence in defendant's own testimony from which the jury could find that Earl Barts killed the victim in furtherance of a plan to rob him.

**11. Robbery § 4.6— armed robbery—evidence sufficient**

The evidence was sufficient to convict defendant of robbery with a dangerous weapon where defendant went to the victim's residence armed with a baseball bat and a crowbar; defendant stated after the event that he had beaten and robbed the victim; defendant shared in the proceeds of the taking; the court instructed the jury that it could convict under the doctrine of acting in concert; and there was sufficient evidence to support a finding that Earl Barts perpetrated the robbery in furtherance of a common plan, so that defendant could be convicted even if the jury believed his statement and testimony that he did not participate in the actual robbery.

**12. Burglary and Unlawful Breakings § 5— burglary—evidence sufficient**

There was sufficient evidence to convict defendant of second degree burglary where defendant admitted that he pried open the door to the victim's house and entered with the intent to steal anything of value he could find and that he stole several items from the residence.

**13. Larceny § 7.7— larceny of a pickup truck—truck subsequently abandoned—evidence sufficient**

The evidence was sufficient to convict defendant of felonious larceny of the victim's pickup truck where defendant, acting alone or in concert, stole the victim's pickup truck; the truck was subsequently abandoned some distance from the victim's residence; and there was no evidence that defendant ever intended to return the property to the victim.

**14. Burglary and Unlawful Breakings § 5.8— breaking or entering—storage shed—evidence sufficient**

The evidence was sufficient to convict defendant of felonious breaking or entering even though the victim's storage shed was not completely enclosed where the State produced substantial evidence that defendant entered the shed. N.C.G.S. § 14-54(a).

**15. Homicide § 30.3— murder—failure to instruct on voluntary and involuntary manslaughter**

The trial court did not err in a murder prosecution by not instructing the jury on voluntary and involuntary manslaughter where there was no evidence of provocation or self-defense, no evidence that the victim died as a result of an unlawful act not rising to a felony or naturally dangerous, and no evidence that death resulted from a culpably negligent act or omission.

**16. Criminal Law § 138.24— aggravating factor—victim very old—victim chosen partly for age—no error**

The trial court did not err when sentencing defendant for armed robbery by finding in aggravation that the victim was very old where the victim was age seventy-four, five feet eight inches tall and weighed two hundred pounds, did a great deal of gardening and yardwork, was very strong and physically active for his age, was able to inflict a minor injury on one of his assailants, and was selected as a victim because he was old and was known to carry large sums of money on his person. The victim's age made him more vulnerable than he would otherwise have been because his age led to his selection as a victim. N.C.G.S. § 15A-1340.4(a)(1)(j) (1983 and Cum. Supp. 1985).

**17. Criminal Law § 138.26— aggravating factor—taking of property of great monetary value—$3,200 divided three ways—no error**

The trial court did not err when sentencing defendant for armed robbery by finding in aggravation that the offense involved the taking of property of great monetary value. An element necessary to prove the offense was not used to prove the aggravating factor because armed robbery does not require proof that the property was actually taken, and the fact that the $3,200 was split three ways does not prohibit enhancement of punishment because the factor speaks to the value of the property taken or attempted to be taken and not

to the value of the property ultimately retained or possessed by the defendant. N.C.G.S. § 15A-1340.4(a)(1)(m), N.C.G.S. § 15A-1340.4(a)(1).

**18. Criminal Law § 138.29— nonstatutory aggravating factor—defendant also committed larceny of a firearm—not charged—no error**

The trial court did not err when sentencing defendant to a greater than presumptive term for second degree burglary by finding as an aggravating factor that defendant admitted that he also committed larceny of a firearm, although he was not charged with that offense. Evidence of the taking of a firearm was not necessary to prove an element of burglary and this nonstatutory aggravating factor was reasonably related to the purposes of sentencing, particularly in view of the possibility that the firearm may have been taken with an eye toward using it against the victim. N.C.G.S. § 15A-1340.3 (1983 and Cum. Supp. 1985).

**19. Criminal Law § 140.3— consecutive sentences—no error**

The trial court did not err by ordering that defendant's consolidated convictions for breaking or entering and larceny be consecutive with a second degree burglary conviction. The trial court was given express authority by N.C.G.S. § 15A-1354(a) to require that the sentence imposed for a conviction be served consecutive to any sentence served at the same time or any undischarged term to which defendant is already subject.

**20. Constitutional Law § 81— consecutive sentences—not constitutionally disproportionate**

The imposition of consecutive sentences for conspiracy to commit armed robbery, first degree murder, armed robbery, second degree burglary, breaking or entering, and larceny did not violate any constitutional proportionality requirement where all of the sentences were within the limits prescribed by the General Assembly. Eighth Amendment to the U.S. Constitution.

BEFORE *Hobgood, J.*, at the 16 April 1984 Criminal Session of Superior Court, ALAMANCE County, defendant was convicted of first-degree murder, robbery with a dangerous weapon, second-degree burglary, felonious breaking or entering, and felonious larceny. The defendant also pled guilty to felonious conspiracy to commit robbery with a dangerous weapon. Following a sentencing hearing held pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to life imprisonment for the murder conviction. The trial court entered judgment sentencing the defendant to life imprisonment for the murder conviction, three years imprisonment for the conspiracy conviction, forty years imprisonment for the armed robbery conviction, thirty years imprisonment for the burglary conviction, and three years imprisonment for the consolidated breaking or entering and larceny convictions, all sentences to be served consecutively. The

defendant appeals from the imposition of the life sentence as a matter of right pursuant to N.C.G.S. § 7A-27(a). We allowed the defendant's motion to bypass the Court of Appeals on the other convictions on 26 September 1984. Heard in the Supreme Court 10 March 1986.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Daniel H. Monroe for defendant-appellant.*

MEYER, Justice.

The defendant and Charlie Mann were tried jointly for various crimes arising out of events occurring in Alamance County in the fall of 1983. The State's evidence tended to show that in September 1983, Richard Lockamy and his fiancee, Penelope Dawkins, moved into a mobile home in the Shady Grove Mobile Home Park in Mebane, North Carolina. The defendant was the manager of the mobile home park. Around the first of October, Lockamy and Dawkins became acquainted with Charlie Mann, who lived approximately a mile from the mobile home park. Over the next several weeks, they performed various services for Mann, including chopping firewood, painting, mowing his lawn, and cleaning his house. Lockamy and Dawkins saw Mann approximately two or three times per week during this period.

At some point, Mann told Lockamy about an elderly man, Richard Braxton, who lived in the Sutphin Mill Road area. Mann told Lockamy that Braxton generally carried a large sum of money with him, and he was of the opinion that it would be quite easy to rob him. Mann went on to say that two or three people would be needed to carry out the robbery, and he asked Lockamy if he would be interested in participating in such a scheme. Lockamy indicated that he might be willing to participate in such a plan. A few days later, Mann and Lockamy drove out to Braxton's house. At that time, Lockamy told Mann that he would be willing to rob Braxton.

Approximately a week later, Mann told Lockamy that he had previously persuaded the defendant to burglarize the home of one of his (Mann's) former girlfriends. Later, Lockamy told the defendant about Mann's scheme to rob Braxton and asked if he

would like to participate. The defendant answered in the affirmative.

The next day, the defendant introduced Lockamy to John David "Fireball" Holmes. The defendant asked Lockamy if Holmes could join in the scheme. Lockamy replied that he would think about it. The next day, Lockamy, Holmes, the defendant, and the defendant's wife drove out to Braxton's house in order to determine how best to carry out the robbery. The next night, Lockamy, Holmes, and the defendant drove out to Braxton's house to commit the robbery. The defendant and Holmes were to carry out the robbery while Lockamy drove the car. However, when they were alone, the defendant and Holmes decided that they no longer wanted Lockamy as a partner in the scheme. The defendant told Holmes that he was going to tell Lockamy that they had been unable to carry out the robbery due to the fact that Braxton had a visitor. When Lockamy picked them up, the defendant recited this story and they returned home.

The defendant and Holmes then decided to ask Earl Barts, defendant's cousin, to join them in the robbery scheme. On 18 November 1983, the defendant and Holmes met with Earl Barts and told him about the planned robbery. Earl Barts agreed to join them, and they decided to get together the following afternoon.

On the afternoon of 19 November 1983, the three met at a local bar and then proceeded to Earl Barts' mobile home. Once at the mobile home, they discussed how to carry out the robbery. During this discussion, the defendant and Earl Barts were drinking vodka and smoking marijuana. Between 7:00 and 7:30 p.m., they left Earl Barts' residence and drove to Braxton's house in Holmes' 1973 Thunderbird. They took a wooden, rubber-headed mallet and a baseball bat with them. During the drive, the defendant and Earl Barts were drinking beer.

When they arrived in the vicinity of Braxton's house, Holmes let the defendant and Earl Barts out of the car and he drove down the road to a prearranged spot to wait for them. After approximately thirty minutes had passed, Holmes drove back toward the house. Earl Barts came up to the car and stated that they had broken into the house but that Braxton had not yet returned home. Earl Barts showed Holmes a .22-caliber pistol which he said they had found on a bed in the house. Earl Barts in-

structed Holmes to drive back down the road and wait for them. Holmes did so. Approximately two hours later, Holmes saw the defendant and Earl Barts driving Braxton's pick-up truck. They pulled up beside the car, got out, and entered the car. The three then drove off. Holmes asked what had occurred at the house. The defendant replied that they had been forced to beat Braxton but that he was all right. They proceeded back to Earl Barts' mobile home and divided the $3,200 which the defendant and Earl Barts had taken.

The next day, the defendant went over to visit Lockamy and Dawkins. He told them that he had robbed Braxton the previous evening and that he thought he may have killed him. The defendant told them that he jumped Braxton when he arrived home and that he "beat the old motherf---er until I got plumb tired of beating him." The defendant further stated that during the beating, Braxton screamed, "Oh, God, you're gonna kill me." The defendant then warned Lockamy and Dawkins not to tell anyone of his involvement in the crime.

Braxton's body was discovered by a neighbor on the morning of 20 November 1983. The body was found lying on a bench on the porch. Dr. Robert Anthony, the Assistant Chief Medical Examiner with the State Medical Examiner's Office, performed an autopsy on Braxton's body on 21 November 1983. The autopsy revealed at least six large lacerations on the left forehead and a number of other small cuts on the face and scalp. Both eyes were blackened and there were bruises on the face and chest. There was also a long laceration on the second finger of the right hand and an abraded (roughed-up) area on the back of the hand. Dr. Anthony characterized the hand wound as a "defensive wound." The autopsy also showed that the blow or blows to the outside of the scalp had broken the bones of the skull and had driven bone fragments into the brain. Dr. Anthony stated that, in his opinion, Braxton died as a result of blunt trauma to the head.

The defendant was arrested and charged with first-degree murder on 4 December 1983. The defendant was informed of his *Miranda* rights and executed a valid waiver. He then gave a statement in which he acknowledged his involvement in the planning of the robbery. He also admitted in his statement going to Braxton's house on the night of 19 November with Holmes and Earl

Barts. He stated that he used a crowbar to pry open a door and that he and Earl Barts went inside. They searched the house for money but were unable to find any. They then went out and looked in Braxton's shed. They subsequently returned to the house. According to the defendant's statement, Braxton drove up while the defendant was drinking some liquor that he had discovered in the house. The defendant stated that Earl Barts soon yelled for him to come outside. They proceeded to drive off in the truck. At that time, Earl Barts had Braxton's billfold in his hand. The defendant further stated that they drove to the pick-up point, got in the car with Holmes, drove to Earl Barts' residence, and divided up the money.

The State introduced a number of items of physical evidence. Among these were a cloth discovered in Holmes' car which had the presence of blood consistent with that of the victim, a hammer handle and a rubber-headed mallet discovered at Braxton's residence which had on it blood and hairs consistent with the deceased's, and a pocketknife found near Braxton's hand which had blood on it consistent with that of the victim. A baseball bat was also discovered at the victim's residence. Although the bat was found to have human blood on it, the quantity was insufficient to allow blood typing tests to be performed. Also, a boot obtained by the police from the defendant's residence was found to have made an impression discovered in Braxton's storage shed.

The defendant testified in his own behalf. He admitted his involvement in the planning of the robbery, and he acknowledged breaking into and entering Braxton's house and shed (also referred to as the "barn") on 19 November. However, he stated that Earl Barts killed Braxton and that he did not personally attack Braxton on the night in question. He further testified that he did not contemplate or intend that Braxton be killed. The defendant stated that he did talk with Lockamy after the robbery. However, he testified that he told Lockamy that Earl Barts was the one who assaulted Braxton, and he denied telling Lockamy that he beat the victim.

Charles Bowes, an investigator with the Person County Sheriff's Department, testified for the State on rebuttal. He stated that on 13 January 1984, the defendant confessed to having committed a break-in in Person County. Bowes stated that the de-

fendant said that he and two other men committed the break-in and took six to eight firearms. Bowes testified that he had conducted a search of the department's records and determined that the defendant was referring to a break-in which was committed at the home of Virginia Clayton on 4 May 1980.

Based on this and other evidence, the defendant was convicted of first-degree murder, robbery with a dangerous weapon, second-degree burglary, felonious breaking or entering, and felonious larceny.[1] During the course of the trial, the defendant had pled guilty to felonious conspiracy to commit robbery with a dangerous weapon. Following a sentencing hearing held pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to life imprisonment for the first-degree murder. The trial court entered judgment sentencing the defendant as previously indicated.

[1] The defendant initially argues that the trial court erred by denying his motion to suppress the inculpatory statement which he made to the authorities on 4 December 1983. The defendant contends that the statement was inadmissible because it was actually reduced to writing by SBI Agent Terry Johnson rather than himself. This argument is meritless.

It is well established that there is no requirement that a defendant's inculpatory statement be in his handwriting in order to be admissible against him. *State v. Schneider*, 306 N.C. 351, 293 S.E. 2d 157 (1982); *State v. Boykin*, 298 N.C. 687, 259 S.E. 2d 883 (1979), *cert. denied*, 446 U.S. 911, 64 L.Ed. 2d 264 (1980). Where a defendant's statement is reduced to writing by another person, it is admissible if it is shown that the statement was freely and voluntarily given, it was read to or by the accused, and it was signed by him as a correct transcription of the statement. *State v. Boykin*, 298 N.C. 687, 259 S.E. 2d 883, *cert. denied*, 446 U.S. 911, 64 L.Ed. 2d 264. Here, Agent Johnson testified that he transcribed the defendant's statement exactly as it was given, he read it back to the defendant and asked if any changes or corrections needed to be made, the defendant indicated that one change needed to be made (substitution of the word "after" for the word "before" at

---

1. The defendant's codefendant, Charlie Mann, was convicted of solicitation to commit common law robbery.

one point in the statement), and the defendant then read the statement and signed it. The defendant does not contest the trial court's conclusion that the statement was made freely and voluntarily. Furthermore, he has not challenged the accuracy of the written transcription. Since the defendant signed the statement after it was read to him and after having read it himself, it was properly admissible against him.

[2] The defendant next argues that the trial court erred by denying his pretrial motion to prohibit the prosecution from "death qualifying" the jury. In this motion, the defendant asserted that the practice of "death qualifying" a jury in capital cases violates the sixth and fourteenth amendments to the United States Constitution and Article I, Section 19, of the North Carolina Constitution.

In the recent case of *Lockhart v. McCree*, --- U.S. ---, 90 L.Ed. 2d 137 (1986), the United States Supreme Court held that the federal Constitution does not prohibit the removal for cause, prior to the guilt-innocence determination phase of a capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would substantially impair the performance of their duties as jurors at the sentencing phase of the trial. In reaching this conclusion, the Court initially noted that there were "several serious flaws" in the social science studies presented by the defendant which concluded that "death qualified" juries are more conviction-prone than those which are not "death qualified." *Id.* at ---, 90 L.Ed. 2d at 144-45. These "flaws" included the fact that several of the studies dealt solely with generalized attitudes and beliefs about the death penalty and the criminal justice system; that several of the studies were based on responses of individuals randomly selected from some segment of the population, but who were not actual jurors in a case; and that only one of the studies took into account individuals who, because of their violent opposition to capital punishment, would be unable to decide a capital defendant's guilt or innocence fairly and impartially. *Id.* at ---, 90 L.Ed. 2d at 146-47. The Court went on to hold, however, that assuming *arguendo* that the studies were valid and adequate to show that "death qualified" juries are somewhat more conviction-prone than those which are not, the federal Constitution does not prohibit the states from "death qualifying" juries in capital cases.

In arriving at this conclusion, the Court stated that "death qualification" of the jury does not violate the defendant's sixth amendment right to a jury selected from a fair cross-section of the community because this requirement does not extend to petit juries and because those who would refuse to impose the death penalty do not constitute a "distinctive group" for fair cross-section purposes. *Id.* at ---, 90 L.Ed. 2d at 148. The Court also held that the practice of "death qualification" does not violate a defendant's right to an impartial jury. *Id.* at ---, 90 L.Ed. 2d 149. The Court further stated that the practice of "death qualification" served the state's (in that case, Arkansas) "entirely proper interest" in obtaining a single jury which could impartially decide all of the issues in a capital case. *Id.* at ---, 90 L.Ed. 2d at 152.

[3] The *McCree* decision controls the disposition of the defendant's claim that his rights under the United States Constitution were violated by the "death qualification" of his jury. However, in his brief, the defendant states that the right to trial by a fair and impartial jury is a right secured not only by the United States Constitution but also "[g]uaranteed by the Constitution of the State of North Carolina." The defendant further states in his brief:

> Prior to trial, Defendant filed a "Motion to Prohibit Death Qualification of Jury" and a "Motion to Deny Prosecutor's Challenges for Cause of Jurors Unequivocally Opposed to the Death Penalty." The attention of this Honorable Court is directed to those pages of the Record on Appeal for further argument on this point and reasoning in support of these motions.

In his motion to prohibit "death qualification" of the jury, the defendant argued that permitting the prosecution to examine prospective jurors concerning their views on capital punishment violates a defendant's right to an impartial jury "under the Sixth and Fourteenth Amendments to the United States Constitution *and Article I, Section 19, of the North Carolina Constitution.*" (Emphasis added.) We are therefore squarely presented with the issue of whether "death qualification" of juries in capital trials is prohibited by the North Carolina Constitution. We hold that it is not.

Article I, Section 19, of the North Carolina Constitution provides, in pertinent part, that "[n]o person shall be . . . deprived of life, liberty, or property, but by the law of the land." Initially, we note that we have previously expressly held that the practice of "death qualifying" the jury in a capital case does not violate Article I, *Section 19*, of the North Carolina Constitution. *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982). The defendant has presented no argument which convinces us that this case was wrongly decided. The defendant contends that the social science studies cited in *Grigsby v. Mabry*, 758 F. 2d 226 (8th Cir. 1985), *rev'd sub nom. Lockhart v. McCree*, --- U.S. ---, 90 L.Ed. 2d 137, and *Keeten v. Garrison*, 578 F. Supp. 1164 (W.D.N.C. 1984), *rev'd*, 742 F. 2d 129 (4th Cir. 1984), indicate that "death qualified" juries are more conviction-prone than those which are not "death qualified." However, most of these same studies were before the United States Supreme Court in *McCree* and were found to contain "serious flaws."

We hold that the practice of "death qualifying" juries in capital cases violates neither the United States Constitution nor Article I, Section 19, of the North Carolina Constitution. This assignment of error is overruled.

[4]  The defendant next argues that the trial court erred in denying his motion for the sequestration and individual *voir dire* of the prospective jurors. The defendant points out that ten of the first twelve veniremen questioned indicated that they had some prior knowledge concerning the case. He argues that this shows that pretrial publicity concerning the case was so widespread that the sequestration and individual *voir dire* of the jurors was necessary in order to avoid exposing the entire jury panel to the prior knowledge of individual jurors.

N.C.G.S. § 15A-1214(j) provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." This provision does not grant either party any absolute right. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808 (1985). The decision of whether to grant sequestration and individual *voir dire* of prospective jurors rests in the sound discretion of the trial court, and its ruling will not be disturbed absent a showing of an

abuse of discretion. *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Hayes*, 314 N.C. 460, 334 S.E. 2d 741 (1985); *State v. Wilson*, 313 N.C. 516, 330 S.E. 2d 450 (1985).

The record indicates that during the examination of the first twelve veniremen, the trial judge inquired as to how many had read newspaper articles about the case. Four jurors indicated that they had read such articles. The trial judge then ordered that all potential jurors other than the twelve in the jury box leave the courtroom. The four jurors who indicated that they had read newspaper articles about the case, as well as one other juror who subsequently stated that he had read newspaper articles and seen news stories on television concerning the case, were then questioned. They were asked how many articles they had seen, how closely they had read them, whether they had participated in any discussion in the community about the case, and whether they had formed any opinion as to the defendant's guilt or innocence. They were not asked to relate the contents of any of the news stories. One juror stated that, based on what she had read, she had formed an opinion as to the guilt or innocence of the defendant, and she said that she did not feel she could be fair to both the State and the defendant. She was excused for cause. The other four jurors stated that the articles had not caused them to form an opinion about the case, that they would be able to ignore the articles and decide the case strictly on the facts, and that they could be fair to both sides. It is therefore clear that those four jurors who had indicated that they had some prior knowledge of the case unequivocally stated that they could ignore this prior knowledge and could be fair and impartial. More important-ly for purposes of this issue, the record clearly shows that no juror was asked to recite the contents of the newspaper articles. Therefore, it cannot be said that those jurors who had read the articles exposed those who had not to any prejudicial pretrial publicity.

Furthermore, the record appears to indicate that the only feasible location where the jurors could have been individually questioned would have been in one of the Alamance County Dis-

trict Court courtrooms. However, the trial judge stated that "after personally viewing the facilities in the District Court House [sic], and after consulting with the Chief District Court Judge concerning the schedule of the District Court, the Court in its discretion denies the motion [for sequestration and individual *voir dire*]." The trial judge clearly intimated that the district court facilities and trial schedule would not permit the sequestration and individual *voir dire* of prospective jurors. This, coupled with the fact that the defendant has failed to establish that the jury selection process resulted in the "contamination" of other jurors by information from jurors previously exposed to such pretrial publicity, leads us to conclude that the defendant has failed to show that the trial court abused its discretion by denying the motion for sequestration and individual *voir dire*. This assignment of error is overruled.

[5]   The defendant next argues that the trial court erroneously excluded a prospective juror for cause. The record shows that Ms. Robin Mitchell was called as a prospective juror and was questioned by both the prosecution and the defendant. She stated that she could vote to impose the death penalty and was subsequently passed by both sides. While *voir dire* questioning was continuing the next day, Ms. Mitchell asked to address the court. She stated that she had become very agitated and upset as a result of contemplating the possibility of having to decide whether to impose the death penalty. She had found it necessary to consult with a physician about this, and he had prescribed a sedative for her. Upon further questioning by both the prosecution and the defendant, Ms. Mitchell stated that she felt her emotional condition would detract from her ability to concentrate on the case. She also said that she had come to the conclusion that she would be unable under any circumstance to vote to impose the death penalty. The trial court thereupon excused Ms. Mitchell for cause based on her emotional condition and the fact that she had stated that she would be unable to vote for the imposition of the death penalty.

The decision of whether to reopen examination of a juror previously accepted by both parties is a matter within the discretion of the trial court. *State v. Freeman*, 314 N.C. 432, 333 S.E. 2d 743 (1985). Once the trial court has exercised its discretion to reopen the examination of any juror, the trial court may excuse the

juror for cause, *see, e.g.,* *State v. Matthews,* 299 N.C. 284, 261 S.E. 2d 872 (1980); *State v. Kirkman,* 293 N.C. 447, 238 S.E. 2d 456 (1977), and either party may exercise any remaining peremptory challenges to remove the juror. *State v. Freeman,* 314 N.C. 432, 333 S.E. 2d 743.

The record indicates that Ms. Mitchell emphatically stated that there were no circumstances under which she would be able to vote for the imposition of the death penalty. She was therefore properly excused for cause. N.C.G.S. § 15A-1212(8) (1983 and Cum. Supp. 1985); *Wainwright v. Witt,* --- U.S. ---, 83 L.Ed. 2d 841 (1985); *State v. Brown,* 315 N.C. 40, 337 S.E. 2d 808. The defendant contends, however, that there was no showing that Ms. Mitchell could not sit as a juror during the guilt-innocence determination phase of the trial and then be replaced by a "death-qualified" juror during the sentencing phase of the trial. We have held that allowing jurors opposed to capital punishment to serve during the guilt-innocence determination phase and then replacing them at the sentencing phase would violate N.C.G.S. § 15A-2000 (a)(2), which contemplates that the same jury which determines guilt will also recommend the sentence to be imposed. *State v. Bondurant,* 309 N.C. 674, 309 S.E. 2d 170 (1983). Furthermore, the evidence regarding Ms. Mitchell's emotional state also justified her excusal for cause. This assignment of error is overruled.

[6] The defendant's next argument concerns the trial court's denial of his motion for a mistrial based on a newspaper article appearing in a local paper. During the course of the trial, the trial judge repeatedly instructed the jury not to read any newspapers or listen to any radio or television news broadcasts. As noted earlier, during the course of the trial, the defendant pled guilty to the charge of conspiracy to commit armed robbery. As a result of this plea, *voir dire* testimony given by Robert Holmes concerning statements made by Earl Barts after the robbery were ruled to be inadmissible against the defendant. A local newspaper reported the fact that the defendant had pled guilty to the conspiracy charge and recited portions of Holmes' *voir dire* testimony. The next day, the defendant moved for a mistrial based on the publication of the article. The trial judge proceeded to question the jury. He reminded them that at each recess, he had given them certain instructions to follow regarding their duties as jurors. He then asked if any juror had violated any of those in-

structions. One juror responded that she had used the wrong set of stairs when coming into the courthouse the previous day. No other violations were reported. The trial judge found that there had been no showing that any juror had violated any term or condition of responsibility of jury duty and that the jurors had affirmatively stated that they had followed the duties of jurors as instructed by the court. The trial judge therefore denied the motion for a mistrial.

It is well settled that the decision of whether to grant a mistrial rests in the sound discretion of the trial judge and will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Primes*, 314 N.C. 202, 333 S.E. 2d 278 (1985). As noted earlier, a trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Hayes*, 314 N.C. 460, 334 S.E. 2d 741. We detect no abuse of discretion here. The trial court had given the jury various instructions at each recess. Included among these was the instruction that they were not to read any newspapers nor listen to any radio or television news broadcasts. When questioned as to whether they had violated any of the various instructions, only one juror answered in the affirmative. That transgression did not involve a violation of the order to avoid exposure to the news media. The record is completely devoid of evidence that any juror had read or otherwise been exposed to the article in question. Absent such evidence, it cannot be said that the trial court abused its discretion in denying the motion for a mistrial. *State v. McVay*, 279 N.C. 428, 183 S.E. 2d 652 (1971); *State v. Tippett*, 270 N.C. 588, 155 S.E. 2d 269 (1967).

The defendant, however, contends that the trial court failed to conduct an adequate inquiry as to the possible prejudicial effect of the article. He argues that the trial judge was required to specifically question each juror as to whether he or she had read or otherwise been exposed to the article. In support of this contention, the defendant points to *Kirkpatrick v. Rogers and Edmisten*, No. C-78-374-G (1979), a federal *habeas corpus* petition filed in the United States District Court for the Middle District of North Carolina. The defendant there was tried in state court for various property crimes. During the jury *voir dire*, the prosecution asked a prospective juror if he knew the defendant. The juror answered

affirmatively, stating that the defendant had previously attempt-
ed to steal a power saw from him. The juror was excused for
cause, but the trial court did not question the other jurors as to
whether they had been prejudiced by the remark and the court
denied the defendant's motion for a mistrial. The defendant was
convicted and appealed. The Court of Appeals held that although
the statement was prejudicial to the defendant, the trial court did
not err in denying the motion for a mistrial. *State v. McAdoo*, 35
N.C. App. 364, 241 S.E. 2d 336 (1978). This Court denied the de-
fendant's petition for discretionary review. *State v. McAdoo*, 295
N.C. 93, 244 S.E. 2d 262 (1978). The federal *habeas corpus* petition
was allowed based upon the fact that the trial judge failed to con-
duct any inquiry into the prejudicial effect that the statement had
on the other jurors. The defendant argues that *Kirkpatrick* com-
pels a finding that the trial court erred by not making a specific
inquiry of the jurors concerning the article. We do not agree.

When there is a substantial reason to fear that the jury has
become aware of improper and prejudicial matters, the trial court
must question the jury as to whether such exposure has occurred
and, if so, whether the exposure was prejudicial. *Aston v. War-
den, Powhatan Correctional Center*, 574 F. 2d 1169 (4th Cir. 1978);
*United States v. Pomponio*, 517 F. 2d 460 (4th Cir.), *cert. denied*,
423 U.S. 1015, 46 L.Ed. 2d 386 (1975). Such an inquiry was con-
ducted in this case. The trial judge questioned the jury as to
whether any of his instructions, which included the repeated com-
mand to avoid exposure to the news media, had been violated.
There has been no showing that this mode of questioning was in-
effective in ascertaining whether exposure to the article had oc-
curred. Indeed, since one juror immediately indicated that she
had inadvertently violated an instruction concerning entry into
the courthouse, we conclude that the trial court's inquiry was suf-
ficient to prod the jurors into divulging whether they had
violated any aspect of the instructions, including reading the
newspaper article.

We hold that the trial court's manner of inquiry was ade-
quate, and as there was no evidence that any juror had read or
otherwise been exposed to the article in question, the Court prop-
erly denied the defendant's motion for a mistrial.

[7]   The defendant next argues that the trial court erred by denying his motion for a mistrial based on certain prejudicial testimony by Penelope Dawkins. During her direct testimony, Dawkins began to testify about statements made by the defendant to the effect that Charlie Mann had "set him up on three jobs." The defendant objected, and the witness was then questioned out of the presence of the jury. Following the *voir dire* examination, the trial court ruled that although Dawkins could testify as to statements made by the defendant or Mann concerning a "job" (i.e., a break-in) committed against Mann's former girlfriend, she could not testify as to other breaking or enterings due to the fact that the evidence was inadequate to show that Dawkins had sufficient knowledge of the "jobs." After the jury returned, Dawkins was asked what she had heard Charlie Mann say about the defendant. She testified that Mann stated that he had known the defendant for several years and had set him up on "three jobs." The defendant immediately objected and made a motion to strike the testimony. The judge sustained the objection and allowed the motion to strike, instructing the jury to disregard Dawkins' testimony concerning the "three jobs." The judge then asked the jury if they could follow that instruction, and all the jurors indicated that they could. The defendant then moved for a mistrial based on that testimony. The motion was denied.

As stated previously, the decision of whether to grant a motion for a mistrial is addressed to the sound discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion. *State v. Primes*, 314 N.C. 202, 333 S.E. 2d 278. Where a trial court sustains an objection to incompetent evidence and instructs the jury to disregard it, the refusal to grant a mistrial based on the introduction of the evidence will ordinarily not constitute an abuse of discretion. *See State v. McCraw*, 300 N.C. 610, 268 S.E. 2d 173 (1980); *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978). The trial court took such action in this case. Furthermore, we note that the trial judge expressly inquired as to whether the jurors could follow his instruction to disregard the evidence. All of the jurors indicated that they could do so. In light of the immediate and thorough curative action taken by the trial court, we hold that there was no abuse of discretion in the trial court's failure to declare a mistrial on this ground.

[8] The defendant next argues that the trial court erred by allowing Investigator Bowes to testify on rebuttal as to the defendant's custodial statement that he and two other men had committed a breaking and entering in Person County. The defendant argues that this testimony was irrelevant. We agree. The State contends that this evidence was clearly admissible to corroborate the testimony of Lockamy and Dawkins that the defendant had told them that he had committed a break-in at the home of a woman and had taken several firearms. However, the defendant objected to this testimony, and we conclude that the objections should have been sustained.

The testimony of Lockamy and Dawkins that the defendant had told them that he had committed a break-in at the home of a woman at the instigation of Charlie Mann constituted the admission of evidence of other crimes committed by the defendant. The same is true of Bowes' testimony as to the defendant's statement that he had committed a breaking and entering in Person County. For actions and proceedings commenced after 1 July 1984, the admissibility of evidence of crimes for which the defendant is not on trial is governed by Rule 404(b) of the North Carolina Rules of Evidence. Because this case was tried prior to the effective date of the evidence code, we must analyze this issue in light of the law existing at that time. At common law, the general rule was that the State may not introduce evidence tending to show that a defendant had committed an independent offense even though it is of the same nature as the charged offense. *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954). In *McClain*, the Court enumerated eight exceptions to this general rule. The sixth exception is as follows:

> Evidence of other crimes is admissible when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the crime charged and to connect the accused with its commission.

*Id.* at 176, 81 S.E. 2d at 367. Evidence offered to show the existence of a plan or scheme must be carefully examined to ensure that it is relevant to show a common design and not merely to show the defendant's propensity to commit the offense charged. *State v. Martin*, 309 N.C. 465, 308 S.E. 2d 277 (1983). There must

be some unusual facts present in both crimes or especially similar acts which would indicate that the same individual perpetrated both crimes. *State v. Moore*, 309 N.C. 102, 305 S.E. 2d 542 (1983).

The State argues that Bowes' testimony, as well as that of Lockamy and Dawkins, was admissible to show that the defendant and Mann were engaged in a common scheme to rob others. We do not agree. The events occurring at Braxton's residence took place in November 1983. The Person County break-in took place in May 1980. The remoteness in time between the alleged offense in 1980 and the crimes allegedly committed by the defendant in 1983 negated the plausibility of the existence of an ongoing plan to engage in a scheme to rob others. *See State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813 (1982). We hold that the trial court erred by allowing Lockamy, Dawkins, and Bowes to testify concerning the defendant's statements as to a prior break-in which he allegedly committed.

However, in light of the overwhelming evidence of the defendant's guilt, including his inculpatory pretrial statement and trial testimony, we conclude that there is no reasonable possibility that had the error not been committed, a different result would have been reached at trial—in other words, the admission of this testimony was clearly harmless. N.C.G.S. § 15A-1443(a) (1983 and Cum. Supp. 1985).

The defendant next contends that the trial court erred by denying his motions to dismiss the charges against him. He argues that the State failed to present sufficient evidence to support any of the convictions.

Before the issue of a defendant's guilt may be submitted to the jury, the trial court must be satisfied that substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Substantial evidence must be existing and real, but need not exclude every reasonable hypothesis of innocence. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). In considering a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to

every reasonable intendment and inference to be drawn there-from. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837; *State v. Bright*, 301 N.C. 243, 271 S.E. 2d 368 (1980). Contradictions and discrepancies in the evidence are for the jury to resolve and do not warrant dismissal. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808; *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114. We will proceed to review each of the defendant's convictions.

[9] The defendant was convicted of first-degree murder. A murder perpetrated by premeditation and deliberation or commit-ted during the perpetration or attempted perpetration of any ar-son, rape or sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon is deemed first-degree murder. N.C.G.S. § 14-17 (1981 and Cum. Supp. 1985). The jury convicted the defendant of first-degree murder under both the theory of premeditation and deliberation and the felony-murder rule.

With regard to premeditation and deliberation, premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is neces-sary for the mental process of premeditation. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808; *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980). Deliberation means an intent to kill, carried out in a cool state of blood in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837; *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982). The phrase "cool state of blood" means that the defendant's anger or emotion must not have been such as to overcome his reason. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768.

Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evi-dence. Instead, they usually must be proved by circumstantial evi-dence. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975). Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the

course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased had been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808; *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 117, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704. We have also held that the nature and number of the victim's wounds is a circumstance from which premeditation and deliberation can be inferred. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982).

We conclude that there was substantial evidence that the killing was premeditated and deliberate and that the court did not err in submitting to the jury the question of the defendant's guilt of first-degree murder based on premeditation and deliberation. There was no evidence that Mr. Braxton in any way provoked the attack. Holmes testified that the defendant went to Braxton's residence armed with a baseball bat and a crowbar. Upon returning to the car, the defendant told Holmes that they "had to beat the man." The day after the killing, the defendant told Lockamy and Dawkins that he had robbed Braxton the previous evening and that he thought he may have killed him. He told them that he had beaten Braxton until he stopped moving and that he "beat the old motherf---er until I got plumb tired of beating him." The victim was brutally beaten to death. Taken in the light most favorable to the State, this evidence was clearly sufficient to support a finding of premeditation and deliberation.

[10] In addition, the evidence supports the jury's finding that the killing occurred during the perpetration or attempted perpetration of a felony within the purview of N.C.G.S. § 14-17. There was plenary evidence that the defendant himself killed Braxton during the commission of the armed robbery. Moreover, the trial judge instructed the jury that it could convict the defendant of first-degree murder under the felony-murder rule if it found that while committing the robbery, the defendant, acting either alone or in concert with Earl Barts, killed Braxton. Under the doctrine of acting in concert, if two or more persons are acting together in pursuance of a common plan or purpose, each of them, if actually or constructively present, is guilty of any crime committed by any

of the others in pursuance of the common plan. *E.g., State v. Woods*, 311 N.C. 80, 316 S.E. 2d 229 (1984); *State v. Joyner*, 297 N.C. 349, 255 S.E. 2d 390 (1979). There is plenary evidence tending to show that the defendant was engaged in a common plan with Earl Barts to perpetrate a robbery against Braxton and that the defendant was present at the scene of the robbery. There was also evidence — specifically, the defendant's own testimony — from which the jury could find that Earl Barts killed Braxton in furtherance of the plan to rob him. Therefore, there was sufficient evidence for the jury to find the defendant guilty of first-degree murder under the felony-murder rule, notwithstanding the fact that it might conclude that he did not participate in the actual killing. We hold that the trial court did not err in denying the defendant's motion to dismiss the first-degree murder charge.

[11]  The evidence also supports the defendant's conviction for robbery with a dangerous weapon. There is substantial evidence tending to show that the defendant used a deadly weapon to facilitate the taking of personal property from Braxton's person. The defendant went to Braxton's residence armed with a baseball bat and a crowbar. After the event, he stated that he had beaten and robbed Braxton. He also shared in the proceeds of the taking. Furthermore, the trial court instructed the jury that it could find the defendant guilty of this offense under the doctrine of acting in concert. The evidence was also sufficient to support a finding that Earl Barts perpetrated the robbery in furtherance of the common plan to rob Braxton. The defendant could therefore be properly convicted of armed robbery, notwithstanding the fact that the jury might believe his statement and testimony to the effect that he did not participate in the actual robbery. *E.g., State v. Joyner*, 297 N.C. 349, 255 S.E. 2d 390; *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated*, 408 U.S. 939, 33 L.Ed. 2d 761 (1972).

[12]  The defendant was also convicted of second-degree burglary. The constituent elements of second-degree burglary are: (1) the breaking (2) and entering (3) in the nighttime (4) into a dwelling house or sleeping apartment (5) of another (6) with the intent to commit a felony therein. *See* N.C.G.S. § 14-51 (1981 and Cum. Supp. 1985); *State v. Jolly*, 297 N.C. 121, 254 S.E. 2d 1 (1979). During cross-examination, the defendant admitted that on the night in question, he pried open the door to Braxton's house and en-

tered with the intent to steal anything of value that he could find and that he, in fact, stole several items from the residence. This candid admission, coupled with the other evidence presented, provided sufficient evidence to justify the submission of the charge of second-degree burglary and to support the jury's finding of guilt.

[13]  With regard to his conviction for felonious larceny of Braxton's pick-up truck, the defendant contends that the evidence showing that he and Earl Barts abandoned the vehicle after arriving at the location where Holmes was waiting shows that he had no intention to permanently deprive Braxton of the truck. He appears to argue that the evidence only indicates an intention to temporarily deprive Braxton of the vehicle.

It is well established that an intent to permanently deprive the owner of the property is a necessary element of the crime of larceny. *E.g., State v. Green,* 310 N.C. 466, 312 S.E. 2d 434 (1984); *State v. Myrick,* 306 N.C. 110, 291 S.E. 2d 577 (1982). In *State v. Smith,* 268 N.C. 167, 150 S.E. 2d 194 (1966), we indicated that the intent to permanently deprive an owner of his property could be inferred where there was no evidence that the defendant ever intended to return the property, but instead showed a complete lack of concern as to whether the owner ever recovered the property. We went on to say in *Smith* that when a thief abandons property which has been stolen, he puts it beyond his power to return the property and shows a total indifference as to whether the owner ever recovers it. Here, the defendant, either alone or acting in concert with Earl Barts, stole the pick-up truck. It was subsequently abandoned some distance from Braxton's residence. There is no evidence that the defendant ever intended to return the property to Braxton. We hold that the defendant's taking and subsequent abandonment of the vehicle put it beyond his power to return and indicated a complete lack of concern as to whether the owner ever recovered the truck. This constituted sufficient evidence of an intent to permanently deprive the owner of the property. *Id.; In re Ashby,* 37 N.C. App. 436, 246 S.E. 2d 31 (1978). Therefore, the trial court did not err in denying the defendant's motion to dismiss this charge.

[14]  Finally, the defendant argues that the evidence was insufficient to sustain a conviction for the felonious breaking or entering

of Braxton's storage shed, as all of the evidence showed that the shed was not enclosed but had an opening in the rear through which one could walk into the storage area. The defendant appears to be implicitly arguing that since the shed was not completely enclosed, there could not have been a "breaking" and therefore his conviction may not stand. This contention is without merit.

The defendant was convicted of felonious breaking *or* entering, a violation of N.C.G.S. § 14-54(a). We have previously held that this provision requires the State to come forward with proof that the defendant "broke" *or* "entered" the building with the requisite unlawful intent. *State v. Myrick*, 306 N.C. 110, 291 S.E. 2d 577. The State need not show both a breaking *and* an entering. *Id.* In this case, the State produced substantial evidence tending to show that the defendant entered the storage shed. A boot obtained by the police from the defendant's residence was found to have made an impression discovered in the storage shed. A crowbar was also found in the shed. Also, in both his statement to the police and his trial testimony, the defendant admitted going into the shed. The trial court did not err in denying the defendant's motion to dismiss the breaking or entering charge.

In summary, we conclude that the State presented substantial evidence tending to prove each essential element of all five offenses charged and that the defendant was the perpetrator of each. Accordingly, we hold that the trial court did not err in denying the defendant's motions to dismiss the charges against him.

The defendant next argues that the evidence was insufficient to support a finding that the murder was committed with premeditation and deliberation, and therefore the trial court erred by instructing the jury that it could convict the defendant of first-degree murder on this basis. As noted previously, we are of the opinion that when taken in the light most favorable to the State, the evidence was sufficient to support a finding of premeditation and deliberation. This assignment of error is overruled.

[15] The defendant next argues that the trial court erred by failing to instruct the jury on the offenses of voluntary and involuntary manslaughter. This argument is without merit.

Voluntary manslaughter is a lesser-included offense of murder. *State v. Brown*, 300 N.C. 731, 268 S.E. 2d 201 (1980); *State v. Montague*, 298 N.C. 752, 259 S.E. 2d 899 (1979). Involuntary manslaughter is also a lesser-included offense of murder. *State v. Greene*, 314 N.C. 649, 336 S.E. 2d 87 (1985); *State v. Mercado*, 314 N.C. 659, 336 S.E. 2d 87 (1985). However, a defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support it. *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645 (1983); *State v. Shaw*, 305 N.C. 327, 289 S.E. 2d 325 (1982); *State v. Duboise*, 279 N.C. 73, 181 S.E. 2d 393 (1971).

Voluntary manslaughter has been defined as the unlawful killing of another without malice and without premeditation and deliberation. *E.g., State v. Rinck*, 303 N.C. 551, 280 S.E. 2d 912 (1981); *State v. Norris*, 303 N.C. 526, 279 S.E. 2d 570 (1981). Generally, voluntary manslaughter occurs when one kills intentionally but does so in the heat of passion suddenly aroused by adequate provocation or in the exercise of self-defense where excessive force is utilized or the defendant is the aggressor. *State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978). There is no evidence whatsoever that the defendant or Earl Barts was acting in self-defense when Braxton was killed. Furthermore, the defendant has failed to point to any evidence which would tend to show that Braxton took any action which would constitute the required level of adequate provocation. The trial court did not err in refusing to instruct the jury on voluntary manslaughter.

Also, the trial court did not err in denying the defendant's request to instruct the jury on the lesser-included offense of involuntary manslaughter. Involuntary manslaughter is the unlawful and unintentional killing of another without malice which proximately results from an unlawful act not amounting to a felony nor naturally dangerous to human life, or by an act or omission constituting culpable negligence. *E.g., State v. Watson*, 310 N.C. 384, 312 S.E. 2d 448 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170. There is no evidence that Braxton died as a result of an unlawful act not rising to the level of a felony or naturally dangerous to human life. Also, there is no evidence that his death resulted from a culpably negligent act or omission. This assignment of error is overruled.

[16] The defendant's next argument centers on the sentence which he received for the armed robbery conviction. He received the maximum term of forty years imprisonment for that offense. The defendant contends that the trial court erred in finding certain factors in aggravation of the armed robbery conviction and that he is therefore entitled to a new sentencing hearing on that conviction.

The defendant first argues that the trial court erred in finding as an aggravating factor that the victim was very old. N.C.G.S. § 15A-1340.4(a)(1)(j) (1983 and Cum. Supp. 1985). He argues that although there was evidence that Braxton was seventy-four years old at the time of his death, several witnesses testified to the effect that he was five feet eight inches tall and weighed approximately two hundred pounds, that he did a great deal of gardening and yardwork, and that he was very strong and physically active for his age. The defendant contends that this testimony, coupled with evidence tending to show that Braxton was able to inflict a minor injury on Earl Barts during the assault, compels the conclusion that there was an insufficient showing that the victim's age increased his vulnerability to the crime committed. We do not agree.

In *State v. Hines*, 314 N.C. 522, 335 S.E. 2d 6 (1985), we stated that the age of the victim could not be considered as an aggravating factor in sentencing unless it made the defendant more blameworthy than he already was. We went on to hold that:

> A victim's age does not make a defendant more blameworthy unless the victim's age causes the victim to be more vulnerable than he or she otherwise would be to the crime committed against him or her, as where age impedes a victim from fleeing, fending off attack, recovering from its effects, *or otherwise avoiding being victimized.*

*Id.* at 525, 335 S.E. 2d at 8 (emphasis added). Although, as recognized in *Hines*, a victim's vulnerability to the particular harm that the crime entails is the *concern* that this aggravating factor addresses, one of the underlying *purposes* of the factor is to deter wrongdoers from taking advantage of a victim because of his youth or extreme age. *State v. Mitchell*, 62 N.C. App. 21, 302 S.E. 2d 265 (1983).

The evidence in this case clearly shows that Braxton was selected as a robbery victim because he was known to carry large sums of money on his person and because he was old. In his statement to the police, the defendant said, "According to Rick [Lockamy], Charlie Mann had told him the old man carried a lot of money in the pockets of his bib overalls. *Rick said the old man was real old and it would be easy to rob him.*" (Emphasis added.) John Holmes testified that the defendant told him "he knew where there was a lot of money *on an old man.*" (Emphasis added.) The evidence clearly indicates that Braxton was singled out for the robbery because of his propensity for carrying large sums of money and because of his advanced age. Where a defendant decides to perpetrate a crime against an individual based in part on the likelihood that the crime will be successfully completed because of the intended victim's advanced age, we feel that the victim's age has indeed made him more vulnerable than otherwise would be the case because it was the very fact of his advanced age which led to his selection as the victim, and the trial court may properly find this aggravating factor. Such a finding responds to the requirements in *Hines* that the age of the victim must increase his vulnerability, while at the same time furthering the deterrence purpose of the factor. Since the evidence clearly shows that Braxton was singled out for the robbery, in part because of his advanced age, we hold that the trial court did not err in finding this factor in aggravation of the armed robbery.

[17]     The trial court also found as a factor in aggravation of the robbery that the offense involved the actual taking of property of great monetary value. N.C.G.S. § 15A-1340.4(a)(1)(m) (1983 and Cum. Supp. 1985). The defendant initially argues that this violates the prohibition contained in N.C.G.S. § 15A-1340.4(a)(1) that evidence necessary to prove an element of the offense may not be used to prove any aggravating factor. This contention is meritless. The appellate courts of this state have previously held that since the crime of armed robbery does not require proof that property was actually taken — the mere *attempt* to take property by use of a firearm or other deadly weapon is sufficient — this aggravating factor may be properly found in armed robbery cases. *E.g., State v. Thompson,* 64 N.C. App. 485, 307 S.E. 2d 838 (1983), *cert. denied,* 313 N.C. 513, 329 S.E. 2d 399 (1985).

The defendant also contends that the trial court erred in finding this aggravating factor because $3,200—the amount of money the evidence indicated was taken from Braxton—divided three ways does not qualify as "property of great monetary value." The defendant implicitly argues that the court must look at the value of the property which a defendant ultimately receives in order to decide whether this aggravating factor may be properly found. We do not agree.

Language in *State v. Aldridge*, 76 N.C. App. 638, 334 S.E. 2d 107 (1985), would appear to lend some support to the defendant's contention. There, the Court of Appeals in discussing this aggravating factor, stated, "The gist of G.S. 15A-1340.4(a)(1)(m) is the value of the property and not whether there was a taking or attempted taking of the property. The aspect of the designated aggravating factor which permits enhancing the punishment is the great value of the personal property *in possession of the defendant.*" *Id.* at 642, 334 S.E. 2d at 109 (emphasis added). However, we do not feel that this aggravating factor should be read to limit the trial court to an examination of the value of the property which the defendant ultimately possessed. The factor speaks of the value of the property *taken*—or attempted to be taken—not the value of the property which is ultimately retained or possessed by a particular defendant. Since the evidence tended to show that the defendant, acting alone or in concert with Earl Barts, *took* $3,200 from Braxton during the armed robbery, the court could properly find this aggravating factor if $3,200 constitutes "property of great monetary value." We hold that it does. Property valued at less than $3,200 has been found to be of "sufficiently great monetary value" to support a finding of this aggravating factor. *See, e.g., State v. Simmons*, 65 N.C. App. 804, 310 S.E. 2d 139 (1984) (taking of billfold containing $2,500 was sufficient to support this finding). We hold that the trial court properly found as a factor in aggravation of the armed robbery that it involved the actual taking of property of great monetary value.

[18] The defendant's next argument relates to the sentence imposed for his conviction for second-degree burglary, a term which exceeded the presumptive sentence of twelve years. The trial judge found as a nonstatutory aggravating factor for this offense that "[a]t the time the defendant committed this second degree burglary he also committed larceny of a firearm which was not

charged in this case but which the defendant admitted performing the actions which constituted the elements of larceny of a firearm when he testified at trial." The defendant contends that the trial judge erred in finding this nonstatutory aggravating factor, because it was an inherent part of the crime for which he was convicted, it constituted evidence necessary to prove an element of the offense, and it was not reasonably related to the purposes of sentencing. We do not agree.

Initially, it is clear that evidence of the taking of the firearm did not constitute evidence necessary to prove an element of the offense. In order to achieve a conviction for second-degree burglary, it is not necessary for the prosecution to show that the accused committed a felony in the home or sleeping apartment which was broken into. It is sufficient if the State establishes that the accused possessed the intent to commit such a crime, all other elements of second-degree burglary being present. *See, e.g., State v. Wells*, 290 N.C. 485, 226 S.E. 2d 325 (1976); *State v. Bell*, 285 N.C. 746, 208 S.E. 2d 506 (1974). Since the State was not required to show that the defendant committed any larceny, it cannot be said that the evidence of the larceny of the firearm was evidence necessary to prove an element of the offense of second-degree burglary. Furthermore, the taking of the firearm was not an inherent part of the burglary. The evidence shows that the defendant and Earl Barts broke into the house in order to rob Braxton and/or look for money in the house. The taking of the firearm was in no way "inherent" in the burglary.

The claim that the finding of this aggravating factor was not reasonably related to the purposes of sentencing is equally meritless. One of the primary purposes of sentencing is to impose a punishment commensurate with the injury the offense has caused, taking into consideration factors which may diminish or enhance the offender's culpability. N.C.G.S. § 15A-1340.3 (1983 and Cum. Supp. 1985). The theft of this firearm, particularly in view of the possibility that it may have been taken with an eye toward using it against the victim, clearly increases the defendant's culpability. This assignment of error is overruled.

[19] The defendant next argues that the trial court erred by ordering that the three-year term of imprisonment for the consolidated convictions for breaking or entering and larceny be made to

run consecutive to the sentence imposed for the second-degree burglary conviction. We reject this contention. A trial court is given express authority by N.C.G.S. § 15A-1354(a) to require that the sentence imposed for a conviction be served consecutive to any sentence imposed at the same time or any undischarged term of imprisonment to which the defendant is already subject. We have held that there is nothing inherent in consecutive sentencing which violates the Fair Sentencing Act. *State v. Ysaguire*, 309 N.C. 780, 309 S.E. 2d 436 (1983). The defendant's argument that the sentence imposed for these offenses should have been ordered to run concurrent with one of the other terms of imprisonment which were imposed is devoid of merit.

[20]   Finally, the defendant argues that the cumulative effect of the sentences imposed constitutes a violation of the requirement contained in the eighth and fourteenth amendments that a criminal sentence be proportionate to the crime for which a defendant has been convicted. *See Solem v. Helm*, 463 U.S. 277, 77 L.Ed. 2d 637 (1983); *State v. Ysaguire*, 309 N.C. 780, 309 S.E. 2d 436. We do not agree.

We have said that "only in exceedingly unusual non-capital cases will the sentences imposed be so grossly disproportionate as to violate the Eighth Amendment's proscription of cruel and unusual punishment." *State v. Ysaguire*, 309 N.C. at 786, 309 S.E. 2d at 441. We also stated that the imposition of consecutive sentences, standing alone, does not constitute cruel and unusual punishment. *Id.*

We have no hesitation in holding that the imposition of consecutive sentences for conspiracy to commit armed robbery, first-degree murder, armed robbery, second-degree burglary, and breaking or entering and larceny does not violate any constitutional proportionality requirement. All of the sentences were within the limits prescribed by the General Assembly. A review of multiple offense cases in which a first-degree murder was committed indicates that consecutive sentences are frequently imposed. *See, e.g., State v. Miller*, 315 N.C. 773, 340 S.E. 2d 290 (1986); *State v. Riddick*, 315 N.C. 749, 340 S.E. 2d 55 (1986); *State v. Parker*, 315 N.C. 222, 337 S.E. 2d 487 (1985); *State v. Hayes*, 314 N.C. 460, 334 S.E. 2d 741. Considering the gravity of the offenses for which he was convicted, we cannot say that the defendant's

consecutive sentences represent an unusual punishment in North Carolina.

The defendant received a fair trial, free from prejudicial error.

No error.