STATE OF NORTH CAROLINA v. SAMUEL TYRONE MASON

No. 401A93

(Filed 29 July 1994)

**1. Evidence and Witnesses § 162 (NCI4th)— threats to State's witness—relevancy**

Testimony that defendant and his friends threatened the State's principal witness and warned him not to testify and that

**STATE v. MASON**

[337 N.C. 165 (1994)]

defendant on one occasion shot the witness in the thigh was relevant to show defendant's awareness of his guilt, and the trial court did not err by finding that the probative value of this testimony was not substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence §§ 324 et seq., 443, 543.**

2. **Evidence and Witnesses § 221 (NCI4th)— defendant armed when arrested—relevancy**

Evidence that defendant was armed with a shotgun at the time of his arrest and that he was hesitant to submit to arrest for a murder committed less than a week before was relevant to show defendant's knowledge of his own guilt.

**Am Jur 2d, Evidence § 540.**

3. **Constitutional Law § 313 (NCI4th); Evidence and Witnesses § 1629 (NCI4th)— tape recording—interview with State's witness—insensitive comment by defense counsel—no reflection on representation—no plain error**

The State's introduction of a portion of defense counsel's tape-recorded interview with the State's principal witness in which defense counsel stated, following a discussion of threats to the witness and a statement by the witness that his going home made his mother and grandmother nervous, that "I'm going to be nervous being in court with you" did not reflect upon the substantive aspects of defendant's case and would not necessarily portray defendant's attorney's representation of him as unworthy of serious consideration by the jury. Moreover, any error in the admission of this statement did not constitute plain error, defendant having failed to object thereto, since defendant has not shown that a different result would have been reached at trial had this portion of the recording not been played before the jury in light of the strong evidence of defendant's guilt, including eyewitness testimony that defendant shot and killed the victim, evidence of motive, and evidence that defendant and his friends threatened the State's principal witness in an effort to prevent him from testifying.

**Am Jur 2d, Criminal Law §§ 752, 985-987; Evidence § 583.**

**Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.**

STATE v. MASON

[337 N.C. 165 (1994)]

4. **Evidence and Witnesses § 179 (NCI4th)— murder case— killing of another gang member—evidence of motive**

The trial court in a first-degree murder prosecution did not err by the admission of evidence of the killing of a member of defendant's "family" called the Pimps where it is clear that such killing, if not the principal reason for the killing of the victim in the present case, was a central and critical fact in the explanation of the sequence of events and motive for the murder in the present case.

**Am Jur 2d, Evidence § 435.**

5. **Constitutional Law § 313 (NCI4th)— opening statement— supporting evidence—no ineffective assistance of counsel**

Defense counsel did not forecast a defense not supported by the evidence and thus deny defendant the effective assistance of counsel by her opening statement that defendant was a "scapegoat" since (1) there was evidence that there were others who had a motive and opportunity to kill the victim and that defendant was, as his counsel claimed, a "scapegoat," and (2) the opening statement did not constitute a "promised defense" within the purview of the decision in *State v. Moorman*, 320 N.C. 387 (1987).

**Am Jur 2d, Criminal Law §§ 752, 985-987.**

**Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.**

6. **Criminal Law § 427 (NCI4th)— jury selection—remark by prosecutor—no improper comment on defendant's failure to testify**

The prosecutor's remark during voir dire of potential jurors that the jury would be hearing from witnesses who were at a party, "both from the State and I would suspect also from the defendant," did not constitute an improper comment directed toward defendant's assertion of his right not to testify but was nothing more than anticipation by the prosecutor that defendant would call witnesses at his trial.

**Am Jur 2d, Trial §§ 237-243.**

**Violation of federal constitutional rule (*Griffin v. California*) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

**7. Criminal Law § 100.1 (NCI4th)— officer's advice that witness not discuss case with others—no prosecutorial misconduct**

A witness's testimony that a police detective advised him not to discuss the case with anyone else was insufficient to establish prosecutorial misconduct resulting in the denial of defendant's right to a fair trial where there was no indication that the witness gave misleading information to defendant's investigators as a result of the detective's alleged instructions or that the detective instructed the witness to take such action in the event of further inquiry about the case.

**Am Jur 2d, Depositions and Discovery §§ 400 et seq.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Read, J., at the 29 March 1993 Criminal Session of Superior Court, Durham County, upon a jury verdict of guilty of first-degree murder. Calendared for argument in the Supreme Court 12 April 1994; determined on the briefs without oral argument.

*Michael F. Easley, Attorney General, by Marilyn R. Mudge, Assistant Attorney General, for the State.*

*Irving Joyner for defendant-appellant.*

MEYER, Justice.

On 7 October 1991, defendant Samuel Tyrone Mason was indicted for the first-degree murder of Fredrick Harris. Defendant was tried noncapitally, and on 2 April 1993, the jury returned a verdict of guilty of first-degree murder. Defendant was sentenced to a term of life imprisonment.

The evidence presented at trial tended to show the following. On 13 September 1991, a party was being given for Tasha Haskins and several of her friends at 1114 Scout Drive in Durham. About seventy-five people, mostly teenagers, were at or around this location; also present was defendant, Samuel Mason.

Around 11:20 p.m. that evening, Officer Mah of the Durham Police Department was dispatched to the area to respond to a noise complaint. After arriving in the area and determining that the noise and the party were under control, Officer Mah departed sometime around midnight. About an hour later, he received another call directing him

**STATE v. MASON**

[337 N.C. 165 (1994)]

to return to the location to respond to a report of a shooting. When he returned to the area, he found the victim, Fred Harris, in a grassy area on Scott Drive. It was later determined that Harris had sustained four gunshot wounds; he had been shot once in the right chest, twice in his back, and once in his lower back just above his left buttock. Fred Harris died as a result of these gunshot wounds.

The State's principal witness, Terrell Frederick Royster, had been in the area and at the party that night. He had known defendant for over two years and was also familiar with the victim.

Royster and defendant had been members of a "family" called the Pimps. Some time prior to the night of Fred Harris' murder, Jamal Hanberry, one of the principal members of the Pimps, had been shot and killed. After Jamal Hanberry's killing, members of the Pimps started getting into trouble, and defendant had been seen carrying a gun. Prior to Jamal Hanberry's murder, the Pimps were mainly interested in girls, money, and clothes, but after Hanberry's murder, defendant wanted the Pimps to become more like a street gang.

Royster saw defendant at the party that evening and testified that while he was dancing, defendant was standing around. Royster presumed that defendant was carrying a gun because he was by himself and had a ski mask hanging out of his pocket. At some point during the evening, a fight broke out between the victim and a friend of Royster's named Pete Shealey. Testimony at trial indicated that the cause of the fight was a remark by the victim that Jamal Hanberry, the leader of the Pimps, had "deserved what he got." Pete Shealey was on the ground, and the victim was on top of him when defendant shot the victim in the back. The victim attempted to run away, but defendant ran after him and continued to shoot him.

About four days after the murder, Royster was approached by Detective Dowdy of the Durham Police Department and was questioned with regard to the murder. At that time, Royster denied knowing anything about the shooting. He agreed to accompany Detective Dowdy to the Police Department for further questioning but again denied having any information regarding the shooting.

Later, Detective Dowdy received information that defendant was the one who shot Fred Harris. He obtained a warrant for defendant's arrest and travelled to the housing project where defendant lived in order to take him into custody. After parking his car and talking with some bystanders, Detective Dowdy saw defendant appear from

behind a building, carrying a shotgun. Detective Dowdy pulled his weapon, ordered defendant to drop the shotgun, and arrested defendant.

At this point in the investigation, Detective Dowdy believed that it was Royster who had been in the fight with the victim immediately prior to the shooting and that he knew who had committed the murder. As a result, Detective Dowdy arrested Royster and charged him with accessory after the fact of the murder that was committed by defendant.

While in jail, Royster indicated that he wished to speak with Detective Dowdy and gave a statement explaining that he had not been the person in the fight with the victim but had in fact seen defendant pull a gun out of his pants and shoot the victim. As a result of this information, Royster's bond was reduced, and he was allowed to leave the jail. Royster testified at trial that it was defendant who had shot the victim.

Other facts will be presented as necessary for the proper resolution of the issues presented by defendant.

In his first assignment of error, defendant contends that a number of errors committed by his counsel during the trial amounted to a denial of his Sixth and Fourteenth Amendment right to the effective assistance of counsel.

In order to resolve the issues in an orderly manner, we will first address and determine the impact of the errors defendant offers as the basis of his claim of ineffective assistance of counsel and then determine the merits of the ineffective assistance claim.

[1] In the first of his assignments of error, defendant contends that the trial judge erred by allowing, and defense counsel erred by not objecting to, evidence that defendant and his friends threatened and even shot witness Royster prior to trial.

Defendant was released from jail pending trial shortly after Royster had given his statement and was released. Royster testified that after defendant had been released and prior to trial, defendant, on a number of occasions, had threatened him and warned him not to testify. On one occasion, defendant shot Royster in the thigh with a pistol. On another occasion, one of defendant's friends pointed a gun at Royster's head, said that he had read Royster's statement, and warned him not to testify in court. Later, when Royster was standing beside a

building, someone shot at him from a moving car. The Durham Police Department helped Royster travel to Atlanta by providing money for bus tickets for him, his daughter, and his daughter's mother.

Defendant contends that this testimony was not relevant for the purpose of proving who shot Fred Harris, that it had no probative value, and that the only purpose for presenting the testimony was to show that the defendant was a bad and violent person with a character consistent with that of a killer. Accordingly, defendant contends, the testimony should have been ruled inadmissible by the trial court.

We have held that "[a]n attempt by a defendant to intimidate a witness in an effort to prevent the witness from testifying or to induce the witness to testify falsely in his favor is relevant to show the defendant's awareness of his guilt." *State v. Hicks*, 333 N.C. 467, 485, 428 S.E.2d 167, 177 (1983). Being relevant, it remained for the trial court to make a determination, pursuant to Rule 403, whether its probative value was substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (1992).

As this Court noted in *State v. Mercer*:

> Rule 403 calls for a balancing of the proffered evidence's probative value against its prejudicial effect. Necessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question, then, is one of degree. The relevant evidence is properly admissible under Rule 402 *unless* the judge determines that it must be excluded, for instance, because of the risk of "*unfair* prejudice."

*State v. Mercer*, 317 N.C. 87, 93, 343 S.E.2d 885, 889 (1986). The decision whether to admit evidence subsequent to a Rule 403 analysis rests within the sound discretion of the trial court, and its ruling will not be overturned unless it is shown that the ruling was "manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986), *quoted in State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992).

In the present case, testimony concerning defendant's threats to the State's principal witness was a strong indication of defendant's awareness of his own guilt. The testimony was not presented in a manner designed to inflame the passions of the jury or otherwise to have "an *undue* tendency to suggest decision on an improper basis." *Mercer*, 317 N.C. at 94, 343 S.E.2d at 889. Defendant has shown no

abuse of discretion on the part of the trial court in the admission of this testimony; accordingly, his assignment of error on these grounds is overruled.

[2] In his second assignment of error, defendant contends that the trial court erred when it allowed, and defense counsel erred by failing to object to, Officer Dowdy's testimony that at the time of defendant's arrest, defendant was armed with a shotgun and Officer Dowdy was forced to draw his weapon and order defendant to drop the shotgun prior to taking him into custody. Again, defendant contends that this testimony was not probative of any fact in evidence and was unduly prejudicial and inflammatory. Defendant contends that the only purpose in admitting this testimony was to portray him as a bad person with the propensity to commit the crime in question.

Details concerning a defendant's arrest may be relevant to prove a number of facts, including defendant's knowledge of his own guilt. In the present case, the record indicates that when defendant was sighted by Detective Dowdy, he did not immediately drop the weapon and surrender, but "stopped behind a bush," and did not drop the weapon until Detective Dowdy instructed him at least twice, at gunpoint, to do so. We are not prepared to say that the fact that defendant was armed with a shotgun and was hesitant to submit to arrest for a crime committed less than a week before has no relevance. " '[E]very circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury.' " *State v. Whiteside*, 325 N.C. 389, 397, 383 S.E.2d 911, 915 (1989) (quoting *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966)) (alteration in original). "The fact to be proved may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action." N.C.G.S. § 8C-1, Rule 401 commentary (1992). As we noted in *State v. McElrath*, "the relevance standard to be applied in this and other cases is relatively lax." *State v. McElrath*, 322 N.C. 1, 13, 366 S.E.2d 442, 449 (1988). The evidentiary fact that defendant was armed and hesitant to submit to arrest is not inconsequential and was relevant to the determination of his guilt in the recent murder of Fred Harris. Defendant has not met his burden of showing that the trial judge abused his discretion in his determination that the probative value of this evidence was not outweighed by the danger of unfair prejudice. We hold that the evidence was properly admitted, and defendant's assignment of error on these grounds is overruled.

**STATE v. MASON**

[337 N.C. 165 (1994)]

**[3]** In his third assignment of error supporting defendant's claim of ineffective assistance of counsel, defendant contends that the trial court erred when it allowed, and defense counsel erred by failing to object to, the State's introduction of certain portions of a tape recording of a statement made by Terrell Royster, in the presence of his attorney, to defense counsel. The pertinent portion of the statement follows a general discussion between the three men about the threats made to Royster, his decision to travel to Atlanta, and the circumstances of his return to Durham:

MR. ROYSTER: I don't like going home, man. It makes my mom nervous and my grandma nervous.

MR. BROWN [Defendant's Attorney]: I understand, man. I can easily understand that. Oh, yes.

MR. ROYSTER: What's so funny, man?

MR. BROWN: I'd be nervous, too.

MR. CAMPBELL [Royster's Attorney]: That was pretty funny to say. That they get nervous. I think I'd be a little nervous, too, with all that shooting going on.

MR. BROWN: To be honest with you, I'm going to be nervous being in court with you.

MR. ROYSTER: Huh?

MR. BROWN: I'm going to be nervous to be in court with you.

Defendant contends that the picture painted of his attorney by this exchange was unflattering and prejudicial and distracted from the credibility of his defense.

At the outset, we note that it is difficult to determine from the record what the impact of this portion of the tape-recorded statement would have been at trial. The comments were but a small portion of an interview that is reproduced in over thirty pages of transcript. A reading of the transcribed recording indicates that defense counsel had, for the most part, established a comfortable and productive rapport with the State's witness. That his attempt at levity may later be viewed as inappropriate or insensitive does not reflect upon the substantive aspects of defendant's case, nor would it necessarily portray defendant's attorney's representation of him as unworthy of serious consideration by the jury.

In addition, defendant failed to object at trial to the admission of this portion of the recording; accordingly, we must analyze the impact of the comments pursuant to a "plain error" analysis. *See State v. Walker*, 316 N.C. 33, 340 S.E.2d 80 (1986). We have described the plain error analysis as follows:

> "[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *'fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has ' "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" ' or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' "

*Id.* at 39, 340 S.E.2d at 83 (quoting *State v. Black*, 308 N.C. 736, 740-41, 303 S.E.2d 804, 806-07 (1983) (quoting with approval *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982))). After doing so, if we conclude that there is not a reasonable probability that the error committed caused the jury "to reach a different verdict than it would have reached otherwise," *id.* at 40, 340 S.E.2d at 84, defendant is not entitled to relief.

Although we do not find it necessary to determine the admissibility of defense counsel's remarks made during the interview of the State's principal witness, we conclude that defendant is not entitled to relief on this basis. The evidence of defendant's guilt in this case was strong: The record as a whole indicates that the witnesses who were in a position to observe the shooting, though not in agreement on some details of the murder, were in agreement that it was defendant who shot and killed the victim. There was evidence of a motive for the killing and that defendant and his friends threatened the State's principal witness in an effort to prevent him from testifying. We conclude that defendant has not shown that there is a reasonable likelihood that had this portion of the recording not been played before the jury, a different result would have been reached at trial. Defendant's assignment of error on these grounds is overruled.

**[4]** In his fourth assignment of error in support of his claim of ineffective assistance of counsel, defendant contends that the trial court erred in admitting, and that defense counsel erred in not objecting to, evidence concerning the death of Jamal Hanberry. Defendant contends that inasmuch as motive is not an element of the offense of first-degree murder, evidence of Jamal Hanberry's killing was unrelated to the present case and was only used to tie defendant to other violent acts. This assignment of error is without merit.

It is well settled that evidence of motive, although not an element of the crime sought to be proved, " 'is not only competent, but often very important, in strengthening the evidence for the prosecution.' " *State v. Richards*, 294 N.C. 474, 483, 242 S.E.2d 844, 850 (1978) (quoting *State v. Casey*, 201 N.C. 185, 203, 159 S.E. 337, 346 (1931)); *see also State v. King*, 226 N.C. 241, 37 S.E.2d 684 (1946).

In the present case, there was extensive testimony concerning the fact that Jamal Hanberry, a member of defendant's "family" called the Pimps, had been killed prior to the murder at issue. Terrell Royster testified that he, Jamal, and defendant had been original members of the Pimps when it was formed but that defendant had left the group due to a misunderstanding between himself and some of the other members. After Jamal had been killed, defendant rejoined the Pimps, and the group "just started getting bigger and bigger. A lot of people started joining." Royster explained that after Jamal's murder, "[w]e became angry. A lot of us were discouraged and everybody just didn't have nowhere to go. We didn't know where we were going to go and what we were going to do. So we just started getting in trouble a lot." Royster testified that after Jamal's murder, Jamal's brother, Ron Hanberry, became associated with the Pimps. Later in the trial, witness Tasha Haskins testified that on the night of the murder, while at the party, Ron Hanberry told her she "should leave because something about some guy that had something to do with his brother's murder was there and that they were going to do something to him or something like that." Finally, although there was no testimony linking the victim with Jamal Hanberry's murder, in the tape-recorded interview with defense counsel, Royster stated that after the shooting, he had asked Ron Hanberry why the victim had been shot; as an explanation, "[Ron Hanberry] said [the victim] said Jamal Hanberry, you know, deserved what he got." The evidence also indicated that Ron Hanberry, upon witnessing the victim engaged in a fight with Pete Shealey, had told defendant to "go ahead and burn him." Ron

Hanberry was also identified as one of the individuals who had threatened Royster and warned him not to testify in this case.

It is clear that the murder of Jamal Hanberry, if not the principal reason for the killing of Fred Davis, is nonetheless a central and critical fact in the explanation of the sequence of events and motive for the present crime. We are not persuaded by defendant's contention that this explanation for the motive of the killing was based solely upon speculation and resulted in unfair prejudice. The trial court properly allowed the admission of testimony concerning Jamal Hanberry's death; accordingly, defendant's assignment of error on these grounds is without merit.

[5] In his final assignment of error presented in support of his claim for ineffective assistance of counsel, defendant contends that defense counsel failed to present evidence to support a defense that she had forecast in her opening statement. We disagree.

The portion of the opening statement upon which defendant predicates this argument is as follows:

> Fred Harris' killer is not Samuel Tyrone Mason. Samuel Tyrone Mason is being used by Fred Harris' killer as a scapegoat. Samuel Tyrone Mason is being used by the State of North Carolina as a scapegoat also.
>
> . . . .
>
> You will find out that Frederick [sic] Harris had a run in with members of the Pimps, had run ins with the Hanberry boys. And you will find that the Hanberrys made threats against Fred Harris.

Defendant contends that the failure to present evidence of these matters constitutes ineffective assistance of counsel in the manner this Court determined it to be ineffective in *State v. Moorman*, 320 N.C. 387, 358 S.E.2d 502 (1987). We disagree.

In *Moorman*, a rape trial, the defendant's attorney "promised in his opening statement to prove that defendant was physically and psychologically incapable of rape." *Id.* at 393, 358 S.E.2d at 506. The defendant in that case testified at a postconviction hearing that he "never told [the attorney] that it was physically or psychologically impossible for him to commit rape. Defendant said he had no idea what [the attorney] meant when he promised to prove defendant was incapable of rape." *Id.* No evidence of such incapability was presented in the trial. We noted that "[t]his promised defense severely

**STATE v. MASON**

[337 N.C. 165 (1994)]

undercut the credibility of the actual evidence offered at trial." *Id.* at 401, 358 S.E.2d at 511.[1]

In the present case, there was evidence that there were others who may have had a motive and the opportunity to kill Fred Harris and that defendant was, as his counsel claimed, a "scapegoat." That defense counsel was not able to convince the jury of this does not demonstrate a lack of effective representation. In addition, the opening remarks made by counsel in the present case do not constitute a "promised defense" in the context determined to be at issue in *Moorman. Id.* Defendant's assignment of error on these grounds is overruled.

We now determine whether defendant's assigned errors, taken singly or in combination, merit relief on the basis that he was denied effective assistance of counsel. We conclude that they do not.

The test to be applied in the determination of whether a criminal defendant has been denied effective assistance of counsel requires the defendant to make two showings. " 'First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.' " *State v. Braswell*, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984)). "Second, defendant must show that 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Moorman*, 320 N.C. at 399, 358 S.E.2d at 510 (quoting *Strickland v. Washington*, 466 U.S. at 693, 80 L. Ed. 2d at 687). "The question becomes whether a reasonable probability exists that, absent counsel's deficient performance, the result of the proceeding would have been different." *Id.* When a court undertakes to engage in such an analysis,

[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

---

1. In holding that the defendant in that case was denied effective assistance of counsel, we based our decision on the defense counsel's "wide-ranging opening assertions, which had no foundation in his pretrial investigation and were never remotely supported by any evidence proffered at trial, . . . [his] closing argument that an important part of his client's testimony was not credible[,] . . . his regular use of a variety of pain killing drugs, his frequent migraine headaches, and his drowsiness, lethargy, and inattentiveness during portions of the trial," and concluded that "a reasonable probability is created that had all these things not occurred the trial outcome might have been different." *Id.* at 402, 358 S.E.2d at 511.

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

*Strickland v. Washington*, 466 U.S. at 689, 80 L. Ed. 2d at 694.

Applying these principles to the present case, we conclude that defendant has not demonstrated that he should prevail in his claim. We have already discussed the effect of each of defendant's assignments of error in support of his claim of ineffective assistance of counsel. In addition, we have noted the strength of the evidence presented against defendant. We conclude that defendant was not denied his right to effective assistance of counsel; accordingly, his assignment of error on these grounds is overruled.

**[6]** In his next assignment of error, defendant contends that he is entitled to a new trial as a result of an impermissible comment by the prosecutor suggesting that he would testify at trial.

The comment about which defendant complains came during the State's *voir dire* of potential jurors:

You're going to be hearing from different kinds of witnesses. Obviously, police officers, medical examiner, other people who were at the scene, a forensic expert from the State Bureau of Investigation[] who will talk about the bullets that killed Freddie Harris.

You, also, obviously are going to be hearing from civilian witnesses, that is, some of the people who were at the party, *both from the State and I would suspect also from the defendant.* There are a few of those names that are particularly significant, at least from the State's point of view and I want to see whether or not you've heard or recognize any of these names.

(Emphasis added.) Defendant did not object to this comment at trial but on appeal contends that it amounted to a "preemptive attack" on his right not to testify.

We do not interpret the comment to be directed toward defendant's assertion of his Fifth Amendment privilege against self-incrimination. Taken in context, the remark appears to be nothing more than anticipation by the prosecutor that the defendant would

call witnesses to testify at his trial. Defendant's assignment of error on these grounds is overruled.

[7] In his final assignment of error, defendant contends that he is entitled to a new trial because during his investigation of the murder, Detective Dowdy took a statement from a witness and told the witness that she was not to talk to anyone else about what she had told him.

The basis for this assignment of error is the portion of witness Tasha Haskins' direct examination in which the prosecutor inquired about statements she gave to investigators for defendant:

Q   Did you tell [the investigators] anything when they were asking them [sic] questions? Did you tell them things that were different from what you've told this jury?

A   Yes.

Q   And do you remember what you told them that was different than what you told the jury?

A   No, I don't.

Q   Let me ask you this, why would you tell them something different from what you told Investigator Dowdy back in September and from what you told the jury today?

A   Because in September of '91, I was not suppose [sic] to mention what I mentioned to Det. Dowdy to anyone because they could use it against me in court or something like that.

Q   What do you mean exactly?

A   Well, Det. Dowdy told me the things that I was telling him, that I shouldn't repeat them to anyone else.

Q   And when did he tell you that?

A   On September 18th of '91.

Q   At the time he talked to you back in September of 1991?

A   Yes.

Q   And when you talked to Investigator Dowdy back in September, did you get the impression from him that you were not suppose [sic] to talk to anybody else about this?

A   Yes, I knew I wasn't suppose [sic] to talk to anyone else about this.

STATE v. MASON

[337 N.C. 165 (1994)]

Q   So—

A   (Interposing) Why did I talk to somebody else?

Q   Why did you talk to somebody else?

A   I don't know. I truly don't know.

Defendant contends that this testimony shows that the State committed an affirmative act that obstructed his efforts to prepare for trial and that, for that reason, his conviction should be reversed.

In a criminal case, "a defendant has the right to attempt to interview any witness he desires, including prospective State witnesses, free from obstruction by the prosecution." *State v. Mason*, 295 N.C. 584, 587, 248 S.E.2d 241, 244 (1978), *cert. denied*, 440 U.S. 984, 60 L. Ed. 2d 246 (1979). " '[A] prosecutor has an implicit duty not to *obstruct* defense attempts to conduct interviews with *any* witnesses; however, a reversal for this kind of professional misconduct is only warranted when it is clearly demonstrated that the prosecutor affirmatively instructed a witness not to cooperate with the defense.' " *State v. Wilson*, 311 N.C. 117, 125, 316 S.E.2d 46, 52 (1984) (quoting *State v. Pinch*, 306 N.C. 1, 12, 292 S.E.2d 203, 214-15 (1982), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994)); *see also State v. Mason*, 295 N.C. at 588, 248 S.E.2d at 244 ("reversal on this ground requires a clear showing that the prosecutor instructed a witness not to cooperate with defendant").

In *Wilson*, a detective at the county jail told the defendant's attorneys that they could not talk to a particular witness, who was incarcerated at the time, without first obtaining permission from the district attorney. The detective testified that he told the defendant's attorneys this "on his own volition and not because the district attorney had given him any instructions concerning [the witness'] visitors." *Wilson*, 311 N.C. at 126, 316 S.E.2d at 52. The defendant's attorneys were not able to talk with the witness that day, and the record indicated that no other attempts were made to interview the witness. *Id.* at 126 n.1, 316 S.E.2d at 52 n.1.

In denying defendant's assignment of error, we concluded:

The defendant's evidence does not show that the district attorney, or anyone acting pursuant to his instructions, affirma-

tively instructed any witnesses not to cooperate with the defendant's attorneys. The evidence was clearly insufficient, standing alone, to establish an obstructing of access to either witness sufficient to impose sanctions in the form of excluding their testimony at the trial of the instant case.

*Id.* at 126, 316 S.E.2d at 52.

We addressed this issue in a similar context in *State v. Pinch,* where the defendant's attorney alleged error in the trial court's denial of his pretrial motion to direct the district attorney to make certain witnesses "available" for interviews. *Pinch,* 306 N.C. at 11, 292 S.E.2d at 214. In his motion, the defendant's attorney alleged "that the district attorney had told [defense counsel] of his specific refusal to allow the interviews in question." *Id.* at 12, 292 S.E.2d at 214. In concluding that the denial of the motion did not deny defendant his right to a fair trial, we noted that

[t]he only indication of *possible* prosecutorial misbehavior is the bare allegation of defense counsel in the motion that the district attorney had told him of his specific refusal to allow the interviews in question. We find nothing in the record to substantiate this claim nor any evidence tending to show that defense counsel actually approached the potential witnesses for the stated purpose only to be rejected on account of the district attorney's prior, direct instructions to them against their cooperation.

*Id.* at 12, 292 S.E.2d at 215. When we examine the circumstances of the present case, we likewise conclude that defendant has not presented sufficient grounds for reversal of his conviction. At most, the testimony of Tasha Haskins demonstrates that Detective Dowdy advised her not to discuss the case with anyone else. Such a showing is not sufficient to establish prosecutorial misconduct resulting in the denial of defendant's right to a fair trial. Further, we are not persuaded by defendant's argument that as a result of Detective Dowdy's alleged instructions to this witness, she gave misleading information to his investigators. There is nothing to indicate that Detective Dowdy instructed the witness to take such action in the event of further inquiry about the case. We hold that defendant has not demonstrated that he was denied his right to a fair trial on these grounds; accordingly, this assignment of error is overruled.

We conclude that defendant received a fair trial, free of prejudicial error.

NO ERROR.