NO. COA14-140

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

STATE OF NORTH CAROLINA

    v.                              Guilford County
                                    No.  08CRS075476
KEITH LAUCHON JACKSON, JR.,
    Defendant.


    Appeal by defendant from Judgment entered 17 June 2013 by

Judge John O. Craig, III, in Superior Court, Guilford County.

Heard in the Court of Appeals 4 June 2014.


    *Attorney General Roy A. Cooper III, by Special Deputy
    Attorney General Richard L. Harrison, for the State.*

    *Kathryn L. VandenBerg, for defendant-appellant.*


    STROUD, Judge.


    Keith Jackson ("defendant") appeals from the judgment

entered after a Guilford County jury found him guilty of first

degree murder. We find no error.

## I.   Background

    Defendant was indicted for murder and robbery with a

dangerous weapon on 14 April 2008. The indictments alleged that

defendant robbed a Lucky Mart store in High Point on 31 October

2007 and, in doing so, shot and killed Joshua Sweitzer. Defendant pled not guilty and proceeded to jury trial.

During the lunch break on the first day of testimony, defendant escaped from custody of the sheriffs. As he was being led out of the holding cell, defendant managed to slip out of his leg shackles. Once he was free from his leg shackles, he ran from the bailiffs, fled down a corridor, vaulted about 15 feet over the railing onto the third floor, ran down the stairwell, and exited the courthouse. He was apprehended in a nearby parking lot.

Once he was returned to custody, the trial court addressed counsel. The jury was in the jury room when defendant escaped and none of them could have seen the incident, nor would they have been aware that the courthouse was briefly on "lockdown" due to the incident. So, the trial court decided to tell the jury only that there had been a security incident that would prohibit them from continuing for the day. The judge also decided to give the jurors a security escort to their cars. When he dismissed the jury for the day, he re-emphasized that they were not to read any media coverage of the trial. He further told them that the security escort was "nothing to be concerned

about" and that it was just an effort "to exercise as much caution as need be."

When court reconvened the next morning, defendant moved for a mistrial. He was concerned that the jurors "may have been tainted by the deluge of press coverage and the fact that the facility itself was under lockdown." He further argued that having the jurors escorted to their cars could have been construed as an expression of judicial opinion. He asked the trial court to individually inquire of each juror.

The trial court explained that it had asked the bailiff to ask the jurors whether any of them had seen any reports about the events of the previous day. None of them indicated that they had. The trial court decided that it was unnecessary to individually inquire of the jurors. Instead, once the jury was back in the courtroom, the trial court asked them, as a whole, whether they had followed the court's instructions to avoid any coverage of the trial. None of them indicated that they had violated the court's instructions.

The trial court explained its decision to inquire of the jury as a whole:

> They were probably never fully aware that
> the courthouse was in lockdown mode because
> they were sequestered in the jury room, and
> no one told them anything about what was

going on. But as I had said yesterday, I did it out of an overabundance of caution. And I think in matters such as this, safety concerns always outweigh and are paramount to anything else, and I do not believe that the jury would necessarily connect it to anything involving this defendant, and I do not believe it necessary to conduct individual questioning of the jurors about this.

Before the trial recommenced, the trial court decided to order physical restraints and additional security personnel, including one bailiff standing within arm's reach of defendant. Defendant objected to the added restraints. The trial court conducted the required hearing under N.C. Gen. Stat. § 15A-1031. The trial court found that

in light of the seriousness of the charge, first-degree murder, with the penalty being life imprisonment without the possibility of parole; the fact that the defendant is of a temperament that he sometimes loses his temper, and I have personally seen this in previous hearings as well as his prior attorneys have noted this and reported it to the Court; the defendant's relatively young age and his obvious nimbleness in being able to escape yesterday; the fact that he has made threats to harm others or cause a disturbance in the past, both to his prior attorneys and making statements to others; as well as the nature and physical security of the courtroom; and again, the need to protect those immediately around the defendant from any potential harm, the Court will find that it is necessary to restrain the defendant during the trial.

It concluded that

> the restraint [was] reasonably necessary to maintain order, to prevent another escape attempt, and to provide for the safety of other persons in the defendant's immediate vicinity here in the courtroom. So I believe that in light of the events of yesterday, it is necessary for me to take this action.

After asking the jurors whether they had seen any coverage of the trial, the trial court instructed the jury on the additional restraints. It stated,

> I am instructing you that the defendant has been placed in some physical restraints, and I do not -- I am ordering you not to consider this in any fashion, whether in terms of weighing the evidence or in determining the defendant's guilt or innocence in this matter. You are to conduct yourselves just in a manner as if the defendant had not been placed in any restraints.

Defendant did not object to these instructions or request additional cautionary instructions. The remainder of the trial proceeded without incident.

At trial, the State's evidence showed the following:

On the evening of 31 October 2007, Josh Sweitzer was working the cash register in a Lucky Mart convenience store owned by his uncle, Travis Luck. Mr. Luck left the store to get Mr. Sweitzer some dinner. As he was leaving, he saw two men standing outside of the store. He asked them what they were

doing. They claimed to be waiting for a ride.  One of the men was defendant.

After Mr. Luck left, two men walked into the store wearing bandanas over their faces and hoods covering their heads.  One of the men walked up to the cash register and demanded money from Mr. Sweitzer. Mr. Sweitzer did not respond, so the man shot him in the head. He then approached the only customer in the store and demanded money from his wallet. The customer opened his wallet to show the gunman that he only had $7. The two perpetrators then walked out of the store without taking any money.  Mr. Sweitzer died of a single gunshot wound to the right side of his forehead.  When Mr. Luck returned to his store, police had already responded to the scene and were in the process of putting up crime scene tape.

The next morning, Officer Kyle Shearer searched the area around the Lucky Mart. He found a blue baseball hat hidden in a bush, a camouflage bandana on the ground, and a .38 caliber silver revolver within approximately 200 yards of the store. The revolver still had five unspent rounds in it and one spent shell casing.  No fingerprints were found on the revolver and no DNA was found on the bandana. Police were, however, able to

recover DNA from the baseball hat. They later matched its predominate profile to defendant.

Ronnie Covington testified that on 31 October 2007, he and defendant were hanging out, discussing ways to get money, including robbery. Defendant had a .38 caliber revolver with him. Mr. Covington and defendant went to the Lucky Mart store. Mr. Covington went in first to buy a cigar and to see who was in the store and then stepped back out. They both then went into the store, where Mr. Convington confronted the only customer and defendant attempted to rob Mr. Sweitzer. While he was looking at the customer, Mr. Covington heard a single gunshot. He and defendant ran out of the store. Defendant hid his gun under an old car before leaving the area. Over the next several months, defendant, Mr. Covington, and other associates of theirs committed a string of armed robberies in the area.

Matthew Savoy, another one of the men involved in the string of armed robberies, also testified at trial. He testified that defendant said to him: "Man, you missed it. We hit this robbery and we murdered this dude. Man, we went into the store, pointed a gun at him and told him to give me the money. He wouldn't move. He ain't say nothing. So I like, man, give me

the money.   He was just looking at me, so I shot him in the face."

Mr. Savoy also testified that after he and defendant were arrested, they were placed in adjoining pods at the jail. They passed notes back and forth.   Defendant passed one note to Mr. Savoy written in "Crip code," a disguised method of writing used by members of the Crip gang and their associates.   Mr. Savoy explained that defendant is a Crip, but denied being one himself.  Nevertheless, he testified that he could read and understand "Crip code." He translated the note written by defendant as follows:

> Matt, what's cracking, Big Homey. I hope everything 360 with you. Man, look, I just got a visit from my people, and shit, and where it is, Ronnie talking and his cousin Neco snitching on his behalf. That's how Marcel got caught. We was at Neco's house counting loot when we had hit the lick in Lexington. My grandma said they came and searched my crib off a statement somebody wrote. So where do your loyalty lie, Big Homey? You really want a position of power? You want -- you want your mark of purity, Homey? Crip the fool a straight 187, and I'm thinking about admitting my part in all 12 licks so I can pull my 15 to 20 years and build our army, the East 99 Mafia Crips, and get the black book of knowledge. You dig, Big Homey? But shit, I got some canteen coming, so if you want -- if you need something, I'm in M-19. Be safe, Homey.

The note was signed, "Young Blue," which is defendant's nickname. Mr. Savoy explained that "Crip the fool a straight 187" means to kill someone and that, in context, he understood that defendant was asking him to kill Ronnie Covington.[1]

After defendant was arrested, he gave a number of statements to police. He admitting taking part in a string of armed robberies but denied involvement in the Lucky Mart murder. He named a couple people he thought might have been involved with the murder. Defendant later admitted that he made up the story implicating others in the Lucky Mart shooting, but continued to deny that he was involved.

After the State rested, defendant elected to present evidence and testify on his own behalf. Defendant denied participating in the Lucky Mart robbery and denied that he had ever been to the Lucky Mart. He admitted that the blue baseball hat was his, though he acknowledged that he had previously told the police otherwise. Defendant said that he "was lying like hell" when he denied that the hat was his. On cross-examination, the State asked him, over objection, about his

---

[1] Colloquial use of the term "187" to refer to murder seems to be based upon § 187 of the California Penal Code, which defines the crime of murder. See *People v. Jones*, 70 P.3d 359, 376-77 (Cal. 2003) (discussing a Crips affiliate called "the 211 187 Hard Way Gangster Crips"); Cal. Penal Code § 187 (2014) (defining the crime of murder).

escape in detail. The prosecutor also asked him, over objection, if he had been a Crip in 2008. Defendant admitted that he had been, though he denied being able to read or write "Crip code."

The jury found defendant guilty of both attempted armed robbery and first degree murder. The trial court arrested judgment on the robbery conviction. On 17 June 2013, the trial court entered judgment on the murder conviction and sentenced defendant to life imprisonment without parole. Defendant gave notice of appeal in open court.

## II.  Improper Judicial Comment

Defendant first argues that the trial court made an improper judicial comment on his dangerousness in violation of his due process rights and the prohibition of such comment in N.C. Gen. Stat. §§ 15A-1222 and 15A-1232. Defendant reasons that the trial court's decision to order additional security, including physical restraints and an escort for the jury, was akin to a statement by the trial judge that defendant was "highly dangerous, and therefore probably guilty[.]"  We conclude that the trial court did not abuse its discretion or violate defendant's constitutional rights by ordering additional security measures after he attempted to escape.

> While, as a general rule, a criminal
> defendant is entitled to be free from

physical restraint at his trial, unless there are extraordinary circumstances which require otherwise, there is no per se prohibition against the use of restraint when it is necessary to maintain order or prevent escape. What is forbidden—by the due process and fair trial guarantees of the Fourteenth Amendment to the United States Constitution and Art. I, Sec. 19 of the North Carolina Constitution—is physical restraint that improperly deprives a defendant of a fair trial. Such a decision must necessarily be vested in the sound discretion of the trial court.

*State v. Simpson*, 153 N.C. App. 807, 809, 571 S.E.2d 274, 276 (2002) (citations and quotation marks omitted); *see Deck v. Missouri*, 544 U.S. 622, 632, 161 L.Ed. 2d 953, 964 (2005) (noting that "due process does not permit the use of visible restraints *if the trial court has not taken account of the circumstances of the particular case*." (emphasis added)). Additionally, "it is within the judge's discretion, when necessary, to order armed guards stationed in and about the courtroom and courthouse to preserve order and for the protection of the defendant and other participants in the trial." *State v. Tolley*, 290 N.C. 349, 363, 226 S.E.2d 353, 365 (1976).

"We review the trial court's decision of whether to place defendant in physical restraints [and to order additional security measures] for abuse of discretion." *State v. Posey*, ___

N.C. App. ___, ___, 757 S.E.2d 369, 372 (2014) (citations, quotation marks, and brackets omitted). Nevertheless, "[t]he trial court's discretion is not unbridled and must be exercised in a manner that is 'not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by reason and conscience of the judge to a just result.'" *State v. Atkins*, 349 N.C. 62, 92, 505 S.E.2d 97, 116 (1998) (quoting *Langnes v. Green*, 282 U.S. 531, 541, 75 L.Ed. 520, 526 (1931)), *cert. denied*, 526 U.S. 1147, 143 L.Ed. 2d 1036 (1999).

> In deciding whether restraints [and other security measures] are appropriate, a trial court may consider, among other things, the following circumstances:
>
> the seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Posey*, ___ N.C. App. at ___, 757 S.E.2d at 372 (citation and quotation marks omitted).

> [T]he question for decision boils down to this: On the basis of the record before us, can we say, as a matter of law and with definite and firm conviction, that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors?

*Tolley*, 290 N.C. at 369-70, 226 S.E.2d at 369 (citation and quotation marks omitted).

Here, defendant does not argue that the trial court failed to follow the procedure governing the use of restraints at trial under N.C. Gen. Stat. § 15A-1031 (2011). *Cf. Simpson*, 153 N.C. App. at 808, 571 S.E.2d at 275 (considering whether failure to follow § 15A-1031 prejudiced defendant and violated his constitutional rights). Outside the presence of the jury, the trial court made the following findings of fact:

> [I]n light of the seriousness of the charge, first-degree murder, with the penalty being life imprisonment without the possibility of parole; the fact that the defendant is of a temperament that he sometimes loses his temper, and I have personally seen this in previous hearings as well as his prior attorneys have noted this and reported it to the Court; the defendant's relatively young age and his obvious nimbleness in being able to escape yesterday; the fact that he has made threats to harm others or cause a disturbance in the past, both to his prior attorneys and making statements to others; as well as the nature and physical security of the courtroom; and again, the need to protect those immediately around the defendant from any potential harm, the Court

> will find that it is necessary to restrain
> the defendant during the trial.[2]

After bringing the jury back into the courtroom, the trial court specifically instructed the jury not to consider the use of restraints "in any fashion, whether in terms of weighing the evidence or in determining the defendant's guilt or innocence in this matter."

Given the facts of this case, we cannot say that the trial court committed a "clear error of judgment" or arbitrarily decided to place defendant in restraints and order additional security personnel to stand by defendant. Defendant escaped in the midst of this trial. Defendant managed to slip out of his leg shackles while being removed from a holding cell, jump over a railing out to the third floor and then over an outdoor breezeway before being apprehended. Defendant had trouble managing his anger; he had previously threatened to harm others. He was facing the most serious charge possible in this state— first degree murder. His potential punishment upon conviction is the second most serious available in North Carolina—life in prison without the possibility of parole. We do not think the fact that defendant broke his ankle during his escape attempt

---

[2] Defendant does not challenge any of these findings as unsupported by the evidence.

and was in a wheelchair for the rest of the trial makes the court's decision to order additional security measures an abuse of discretion. The trial court must consider not only the potential danger to others in the courtroom from the defendant personally, but also the potential threat that associates of the defendant could pose to the court proceedings and those involved in it.[3]

We have no difficulty concluding that use of restraints and additional security measures—even though visible to the jury—were fully justified by defendant's behavior at trial and before trial. *Cf. Tolley*, 290 N.C. at 370-71, 226 S.E.2d at 369 (holding that the trial court did not abuse its discretion in ordering restraints where the defendant had attempted escape during a preliminary hearing one month before trial); *Holbrook v. Flynn*, 475 U.S. 560, 571, 89 L.Ed. 2d 525, 536 (1986) (approving the use of four visible, uniformed troopers in the first row of the courtroom as security where a defendant "had been denied bail after an individualized determination that [his] presence at trial could not otherwise be ensured").[4]

---

[3] Concern about threats by associates of the defendant was surely justified in this case, as defendant had, while in jail, attempted to solicit an associate to kill one of the witnesses against him, as discussed in more detail below.

[4] Indeed, the United States Supreme Court has approved use of

At oral argument, defendant argued that the trial court's instruction was insufficient because it failed to inform the jury that they were not to consider the fact that they had been escorted to their cars or the additional security personnel in the courtroom. An instruction specifically addressing the use of escorts for the jury would probably just have led the jurors to believe that the need for use of an escort arose from defendant's trial and not from some unrelated incident that might have occurred elsewhere in the courthouse. Otherwise, they had no way to know that the security issue of the previous day was related to defendant's trial until evidence of defendant's escape was introduced. Indeed, defendant did not request a cautionary instruction specifically regarding the escort. Further, an instruction explicitly mentioning each of the additional security measures would likely just have drawn the jury's attention to those measures. "If defendant desired a different . . . instruction he should have requested it at that time." *State v. Hopper*, 292 N.C. 580, 589, 234 S.E.2d 580, 585 (1977); *see Tolley*, 290 N.C. at 371, 226 S.E.2d at 370 (holding

---

restraints far more prejudicial than those at issue here, in appropriate circumstances. *See Illinois v. Allen*, 397 U.S. 337, 343-44, 25 L.Ed. 2d 353, 359 (1970) (opining that one constitutionally permissible response to "an obstreperous defendant" would be to bind and gag him).

that the trial court did not err in failing to instruct the jury to disregard the defendant's shackles where such an instruction was not requested). Therefore, we hold that the trial court's instruction not to consider the restraints was sufficient.

### III. Failure to Individually Inquire

Defendant next argues that the trial court erred and violated his due process rights by failing to individually inquire of the jurors regarding whether they had been affected by the increased security after defendant's escape. We conclude that the trial court's procedure was constitutionally sufficient.

"[W]hen there is a substantial reason to fear that the jury has become aware of improper and prejudicial matters, the trial court must question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial." *State v. Campbell*, 340 N.C. 612, 634, 460 S.E.2d 144, 156 (1995), *cert. denied*, 516 U.S. 1128, 133 L.Ed. 2d 871 (1996). "It is within the discretion of the trial judge as to what inquiry to make." *State v. Willis*, 332 N.C. 151, 173, 420 S.E.2d 158, 168 (1992). The question for us to consider is whether the trial court abused its discretion in directing its inquiry to the jury as a whole rather than the individual jurors.

In *State v. Barts*, the defendant had moved for a mistrial because he feared that the jurors may have read a prejudicial article in the local newspaper. 316 N.C. 666, 681, 343 S.E.2d 828, 838 (1986). The trial court questioned the jury, as a whole, about whether any juror had violated his instructions. *Id.* at 681-82, 343 S.E.2d at 839. The defendant argued on appeal that this method of inquiry was insufficient because the judge did not specifically question each juror. *Id.* at 682, 343 S.E.2d at 839. The Supreme Court held that the chosen method of inquiry was sufficient because "[t]here has been no showing that this mode of questioning was ineffective in ascertaining whether exposure to the article had occurred." *Id.* at 683, 343 S.E.2d at 840.

Here, the only information potentially "conveyed" to the jury was that defendant had attempted to escape.[5] The jurors were in the jury room when defendant attempted to escape. When the trial court dismissed them for the day, the judge explained that there had been a security incident at the courthouse and

---

[5] Defendant also argues that the trial court should have inquired about the impact the additional security measures had on the jury. We have already determined that the additional, visible security measures were warranted by defendant's actions at trial and that the trial court's curative instruction was sufficient. "The law presumes that jurors follow the court's instructions." *State v. Tirado*, 358 N.C. 551, 581, 599 S.E.2d 515, 535 (2004), *cert. denied*, 544 U.S. 909, 161 L.Ed. 2d 285 (2005).

that they would be provided an escort to their cars. The trial court specifically instructed the jury not to look at media coverage of what happened at the court. Without exposure to such media or having witnessed the escape, which none of the jurors did, there is no reason to think that the jurors knew that defendant had escaped and that it was this escape which caused the trial court to order additional security measures.

The only possible exposure to improper, external information concerning defendant's escape attempt would have to come from media coverage. The trial judge had the bailiff question them about whether they had been exposed to any publicity concerning the trial. The judge then followed up with his own inquiry, asking whether they had been exposed to any publicity. None of the jurors indicated that they had.

Under these facts, general inquiry of the jury regarding their exposure to media coverage of the trial was sufficient to ensure that they had not been exposed to improper, prejudicial material. "Additionally, there is no evidence tending to show the jurors were incapable of impartiality or were in fact partial in rendering their verdict." *State v. Taylor*, 362 N.C. 514, 538, 669 S.E.2d 239, 260 (2008), *cert. denied*, 558 U.S.

851, 175 L.Ed. 2d 84 (2009). Therefore, we hold that defendant is not entitled to a new trial on this basis.

### IV. Evidence of Escape Attempt

Defendant next argues that the trial court erred in not excluding evidence of his escape attempt under Rule 403 and in failing to explicitly apply the Rule 403 balancing test.

> [W]hether to exclude evidence under Rule 403 is a matter within the sound discretion of the trial court. This Court will find an abuse of discretion only upon a showing that the trial court's ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision.

*State v. McDougald*, 336 N.C. 451, 457, 444 S.E.2d 211, 214 (1994) (citations, quotation marks, and brackets omitted).

"Evidence of a criminal defendant's flight following the commission of a crime is evidence of his guilt or consciousness of guilt." *State v. Jones*, 347 N.C. 193, 205, 491 S.E.2d 641, 648 (1997). "[A]n escape from custody constitutes evidence of flight." *McDougald*, 336 N.C. at 456, 444 S.E.2d at 214 (citation and quotation marks omitted).

Although defendant persuasively argues that evidence of his escape was highly prejudicial, we fail to see how this evidence was at all *unfairly* prejudicial. Evidence is generally considered unfairly prejudicial when it has "an undue tendency

to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *Id.* at 457, 491 S.E.2d at 214 (quoting N.C. Gen. Stat. § 8C-1, Rule 403 official commentary). Here, the jury may have inferred from the fact that defendant attempted to escape that defendant was guilty of the charges against him. That inference is precisely the inference that makes evidence of flight relevant and it is not an unfair inference to draw. *See id.*

Defendant does not argue that there is some other unfair inference that the jury might have drawn from the flight evidence. Where there is no unfair prejudice, there is no balancing to be done. Therefore, even assuming *arguendo* that the trial court failed to apply the Rule 403 balancing test explicitly, we conclude that the "evidence of the defendant's escape . . . 'could only be viewed as having a *due* tendency to suggest a decision on a *proper basis*.'" *Id.* (quoting *State v. Penley*, 318 N.C. 30, 41, 347 S.E.2d 783, 789 (1986)). Therefore, we hold that the trial court did not abuse its discretion in admitting the evidence of defendant's escape.

## V. Gang-Related Evidence

Defendant finally argues that the trial court erred in admitting the jail letter he wrote to Matt Savoy and in allowing

the State to ask him on cross-examination whether he was in a gang because that evidence should have been excluded under Rule 403. We disagree.

We review the trial court's decision to admit the evidence over defendant's Rule 403 objection for an abuse of discretion. *McDougald*, 336 N.C. at 457, 444 S.E.2d at 214. First, although there was some dispute about its authenticity, the State's evidence showed that defendant wrote a letter to Matt Savoy wherein defendant asked Mr. Savoy to kill Ronnie Covington because Mr. Covington was talking to police. The letter was written in "Crip code." Mr. Savoy testified that Crip code is "a language that Crip[s] came up with dealing with writing so it would be coded, so if anybody wasn't a Crip or affiliated to them, they wouldn't be able to understand it."[6]

The letter itself was relevant and not unfairly prejudicial because in it defendant solicited the murder of one of the State's primary witnesses against him. Such evidence is highly relevant to defendant's consciousness of guilt. Our Supreme Court has held that "an attempt by a defendant to intimidate a witness in an effort to prevent the witness from testifying or

---

[6] Defendant has not argued, either before the trial court or on appeal, that Mr. Savoy was not qualified to interpret the letter, nor has defendant challenged the accuracy of Mr. Savoy's interpretation of the letter.

to induce the witness to testify falsely in his favor is relevant to show the defendant's awareness of his guilt." *See State v. Mason*, 337 N.C. 165, 171, 446 S.E.2d 58, 61 (1994) (citation, quotation marks, and brackets omitted). Soliciting the murder of a witness is "an attempt . . . to prevent the witness from testifying[.]" *Id.* (citation and quotation marks omitted).[7]

Moreover, evidence relating to defendant's gang membership was necessary to understand the context and relevance of the letter. The State properly introduced the letter itself and asked Mr. Savoy, who testified that he could read Crip code, to translate it on the stand.[8] To understand this evidence, it was important for the jury to know what Crip code is and why defendant would be a person capable of writing in this manner.

---

[7] Defendant argues that the letter was less probative than it might otherwise be because Mr. Convington was "talking to police" about other offenses that defendant committed as well, such as the string of robberies and defendant did not specify in the letter which testimony he wanted to prevent. So, the argument goes, defendant could have wanted Mr. Covington dead to prevent his testimony in *those* cases instead of at this trial. This argument is nearly so ludicrous that it does not bear addressing. The State's evidence showed that defendant asked someone to murder a primary witness relevant to this trial. The fact that the letter does not specify that defendant wanted him dead for that reason alone does not make it irrelevant to defendant's guilt.

[8] Defendant had a full and fair opportunity to cross-examine Mr. Savoy and to impeach him as a biased witness.

Additionally, the trial court repeatedly instructed the jury that they were only to consider the gang evidence as an explanation for the note.

Defendant correctly notes that when the prosecutor asked him on cross-examination whether he was a Crip, the trial court overruled his objection without giving a limiting instruction. While it is true that the trial court did not repeat its limiting instruction, no such instruction was requested. Additionally, the question was asked in the context of the prosecutor's cross-examination on the issue of the "Crip code" note. Defendant had denied writing the note and denied even understanding "Crip code." The prosecutor did not encourage the jury to draw an improper inference from this evidence.

In sum, the letter itself was highly relevant and, unlike the cases cited by defendant,[9] here the evidence of defendant's gang membership was properly relevant to his guilt. Under the facts of this case, such evidence "could only be viewed as having a *due* tendency to suggest a decision on a *proper basis*." *McDougald*, 336 N.C. at 456, 444 S.E.2d at 214 (citation and quotation marks omitted). Defendant has failed to show that the trial court abused its discretion in deciding that any unfair

---

[9] *E.g.*, *State v. Hinton*, ___ N.C. App. ___, 738 S.E.2d 241 (2013).

prejudice from the contested evidence did not substantially outweigh its probative value.

## VI. Conclusion

For the foregoing reasons, we conclude that defendant has shown no error at his trial.

NO ERROR.

Judges STEPHENS and MCCULLOUGH concur.